**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

JEFFREY OLSEN,
*Defendant-Appellee.*

</td>
<td>

No. 20-50329

D.C. Nos.
8:17-cr-00076-CJC-1
8:17-cr-00076-CJC

ORDER AND
AMENDED
OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted March 18, 2021
San Francisco, California

Filed April 23, 2021
Amended January 6, 2022

Before: Mary H. Murguia and Morgan Christen, Circuit
Judges, and Barbara M. G. Lynn,[*] District Judge.

---

[*] The Honorable Barbara M. G. Lynn, Chief United States District
Judge for the Northern District of Texas, sitting by designation.

Order;
Per Curiam Opinion;
Concurrence in Order by Judges Murguia and Christen;
Concurrence in Order by Judge Bumatay;
Dissent from Order by Judge Collins

## SUMMARY[**]

### Criminal Law

The panel (1) amended its opinion filed April 23, 2021, reversing the district court's judgment dismissing with prejudice an indictment charging Jeffrey Olsen on 34 counts related to the unlawful distribution of opioids; (2) denied a petition for panel rehearing; and (3) denied on behalf of the court a petition for rehearing en banc.

Olsen was indicted in July 2017. He has since remained on pretrial release and has obtained eight continuances of his trial date, most recently scheduled for October 13, 2020. After the Central District of California suspended jury trials due to the COVID-19 pandemic in March 2020, Olsen invoked, for the first time, his right to a speedy trial. Because jury trials were suspended, the government requested a continuance of Olsen's trial under 18 U.S.C. § 3161(h)(7)(A)—the Speedy Trial Act's "ends of justice" provision. The district court denied the request and, ultimately, dismissed the charges against Olsen with prejudice, concluding that continuances under the ends of

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

justice provision are appropriate only if holding a criminal jury trial would be impossible.

In the amended opinion, the panel wrote that nothing in the Speedy Trial Act limits district courts to granting ends of justice continuances only when holding jury trials is impossible, and that the district court clearly erred by reading the word "impossible" from 18 U.S.C. § 3161(h)(7)(B)(i) in isolation, which is enough to reverse.

The panel wrote that by solely focusing on the word "impossible," the district court also overlooked the rest of § 3161(h)(7)(B)(i), which requires courts to ask whether the district court's failure to apply an ends of justice continuance would result in a miscarriage of justice. The panel concluded that the district court's failure to grant the government's motion for a continuance and subsequent dismissal of the indictment, under the unique facts of Olsen's case and the Central District's suspension of jury trials, resulted in a miscarriage of justice. The panel noted that Olsen, who was granted bond, had obtained eight trial continuances, including one over the government's objection, effectively delaying his trial well over three years; that after the Central District suspended jury trials, Olsen insisted on sticking to his scheduled trial date; and that by that time, the prosecution had been ready for trial for months and was wholly blameless for the Central District's suspension of jury trials.

The panel wrote that the district court also failed to consider other, non-statutory factors. The panel found relevant in the context of the COVID-19 pandemic the following non-exhaustive factors: (1) whether a defendant is detained pending trial; (2) how long a defendant has been detained; (3) whether a defendant has invoked speedy trial

rights since the case's inception; (4) whether a defendant, if detained, belongs to a population that is particularly susceptible to complications if infected with the virus; (5) the seriousness of the charges a defendant faces, and in particular whether the defendant is accused of violent crimes; (6) whether there is a reason to suspect recidivism if the charges against the defendant are dismissed; and (7) whether the district court has the ability to safely conduct a trial.

Though not necessary to its disposition of this case, the panel found it important to highlight the district court's additional error in dismissing the indictment *with* prejudice. The panel wrote that the district court, which primarily based its decision on the perceived need to deter the Central District from continuing its jury trial suspension, committed legal error in failing to consider key factors relevant to Olsen's case: the absence of prosecutorial culpability and the multiple continuances requested by Olsen. The panel wrote that the district court also committed legal error in evaluating the impact of reprosecution on the administration of the Speedy Trial Act and on the administration of justice.

The panel remanded with instructions to reinstate the indictment, grant an appropriate "ends of justice" continuance under § 3161(h)(7)(A), and set the case for trial.

Concurring in the denial of rehearing en banc, Chief Judge Murguia and Judge Christen wrote that they stand behind the opinion because the district court erred by denying the government's motion for an ends-of-justice continuance under the Speedy Trial Act based on a physical impossibility standard, that error required reversal, and it was error to dismiss the indictment with prejudice. The judges wrote that nothing in the opinion minimizes the

importance of the constitutionally guaranteed right to a speedy trial, and this court will surely be presented with future cases in which the balancing required by the Speedy Trial Act will present different results.

Concurring in the denial of rehearing en banc, Judge Bumatay wrote that since Olsen wasn't detained pretrial and the delay here was not long enough to justify dismissal according to our precedent, no speedy trial violation occurred. He wrote that this case would be much different if Olsen had been incarcerated during the COVID-19 pandemic and did not receive the trial he was entitled to under the Constitution.

Judge Collins, joined by Judge Forrest, dissented from the denial of rehearing en banc. He noted that the panel upheld the Central District's lengthy suspension of jury trials by invoking overall public health concerns without ever considering whether there was any way in which criminal jury trials could have been conducted during the pandemic—as the California state courts managed to do. He wrote that even weighty claims of danger to public health must be measured against the demands of the law, and here the relevant provisions of the Speedy Trial Act are fairly stringent. He wrote that under any proper understanding of the Speedy Trial Act, the district court correctly concluded that the Government had failed to show that a further continuance of Olsen's trial was consistent with the Act's standards; and that because Olsen's trial did not take place within the time specified in the Act, the dismissal of the indictment was mandatory, although the district court had discretion to decide whether that dismissal should be with or without prejudice. Judge Collins agreed with the panel's alternative ruling that the district court abused its discretion in dismissing the indictment with prejudice.

## COUNSEL

Charles E. Fowler Jr. (argued) and Bram M. Alden, Assistant United States Attorneys; Scott M. Garringer, Chief, Criminal Division; Tracy L. Wilkison, Acting United States Attorney; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellant.

James H. Locklin (argued), Deputy Federal Public Defender; Cuauhtemoc Ortega, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Defendant-Appellee.

Katie Hurrelbrink and Vincent J. Brunkow, Federal Defenders of San Diego, Inc., San Diego, California, for Amicus Curiae Federal Defenders of San Diego, Inc.

**ORDER**

The Opinion filed April 23, 2021, and published at 995 F.3d 683, is hereby amended.

The panel has voted to deny the petition for panel rehearing and petition for rehearing en banc. The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are **DENIED** (Doc. 48). A concurrence in the denial by the panel and a separate concurrence by Judge Bumatay are filed concurrently with this order, along with a dissent from the denial by Judge Collins.

Appellee's unopposed motion to take judicial notice is **GRANTED** (Doc. 49).

No further petitions for rehearing or rehearing en banc will be entertained in this case.

**OPINION**

PER CURIAM:

The COVID-19 pandemic has presented courts with unprecedented challenges. Among these challenges is determining when and how to conduct jury trials without endangering public health and safety and without undermining the constitutional right to a jury trial. The

United States appeals from the district court's dismissal with prejudice of an indictment against Defendant Jeffrey Olsen. Olsen was indicted in July 2017 on thirty-four counts related to the unlawful distribution of opioids.  He has since remained on pretrial release and has obtained eight continuances of his trial date, most recently scheduled for October 13, 2020.  After the Central District of California suspended jury trials due to the COVID-19 pandemic in March 2020, Olsen invoked, for the first time, his right to a speedy trial.  Because jury trials were suspended, the government requested a continuance of Olsen's trial under 18 U.S.C. § 3161(h)(7)(A)—the Speedy Trial Act's "ends of justice" provision.  The district court denied the request and, ultimately, dismissed the charges against Olsen with prejudice, concluding that continuances under the ends of justice provision are appropriate only if holding a criminal jury trial would be impossible.  Because the district court erred in its reading of 18 U.S.C. § 3161(h)(7)(A), we reverse with instructions to reinstate Olsen's indictment, grant an appropriate ends of justice continuance, and set this case for trial.

## I.

## A.

We have jurisdiction under 18 U.S.C. § 3731.  We review de novo a district court's decision to dismiss on Speedy Trial Act grounds and its findings of fact for clear error.  *United States v. Henry*, 984 F.3d 1343, 1349–50 (9th Cir. 2021) (citing *United States v. King*, 483 F.3d 969, 972 n.3 (9th Cir. 2007)).  A district court's ends of justice determination will be reversed only if it is clearly erroneous. *United States v. Murillo*, 288 F.3d 1126, 1133 (9th Cir. 2002).

**B.**

The Sixth Amendment guarantees all criminal defendants "the right to a speedy and public trial." U.S. Const. amend. VI. Despite this guarantee, however, the Sixth Amendment does not prescribe any specified length of time within which a criminal trial must commence. *See id.* To give effect to this Sixth Amendment right, Congress enacted the Speedy Trial Act, which sets specified time limits after arraignment or indictment within which criminal trials must commence. Pub. L. No. 93-619, 88 Stat. 2076 (1975); *see Furlow v. United States*, 644 F.2d 764, 768–69 (9th Cir. 1981) (per curiam) (describing the Speedy Trial Act as the Sixth Amendment's "implementation").

As relevant here, the Speedy Trial Act requires that a criminal trial begin within seventy days from the date on which the indictment was filed, or the date on which the defendant makes an initial appearance, whichever occurs later. 18 U.S.C. § 3161(c)(1). Recognizing the need for flexibility depending on the circumstances of each case, however, the Speedy Trial Act "includes a long and detailed list of periods of delay that are excluded in computing the time within which trial must start." *Zedner v. United States*, 547 U.S. 489, 497 (2006); *see* 18 U.S.C. § 3161(h). A court may exclude periods of delay resulting from competency examinations, interlocutory appeals, pretrial motions, the unavailability of essential witnesses, and delays to which the defendant agrees. 18 U.S.C. § 3161(h). The Speedy Trial Act also includes an ends of justice provision, allowing for the exclusion of time where a district court finds "that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." *Id.* § 3161(h)(7)(A). In determining whether the ends of justice outweigh the best interest of the public and the

defendant in a speedy trial, the district court must evaluate, "among others," several enumerated factors. *Id.* § 3161(h)(7)(B)(i)–(iv). Most relevant to our analysis is the first enumerated factor: "[w]hether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice." *Id.* § 3161(h)(7)(B)(i).

## II.

### A.

The global COVID-19 pandemic has proven to be extraordinarily serious and deadly.[1] In response, many state and local governments entered declarations curtailing operations of businesses and governmental entities that interact with the public. Beginning on March 13, 2020, the Central District of California—in light of the exigent circumstances brought on by the pandemic and the emergencies declared by federal and state officials—issued a series of emergency orders.[2] Vital to this appeal is the

---

[1] As of April 2021, there have been over 141 million confirmed COVID-19 cases and over 3 million COVID-19 related deaths globally. Over 31 million of those cases are from the United States, with well over half a million deaths. And as of April 2021, California alone has confirmed over 3.6 million cases, with nearly 60,000 deaths.

[2] Among these was the Central District of California's declaration of a judicial emergency pursuant to 18 U.S.C. § 3174, which this Circuit's Judicial Council subsequently approved. *See In re Approval of Jud. Emergency Declared in the Cent. Dist. of Cal.*, 955 F.3d 1140, 1141 (9th Cir. 2020) ("*Judicial Emergency*"). The emergency period runs until April 13, 2021 and extends the Speedy Trial Act's 70-day time limit for commencing trial to 180 days for defendants indicted between March 13, 2020 and April 13, 2021 and not "detained solely because they are awaiting trial." *Id.* at 1141–42; 18 U.S.C. § 3174(b). Because Olsen was

Central District's suspension of criminal jury trials, which began on March 13, 2020. *See* C.D. Cal. General Order 20-02 (March 17, 2020); *see also* C.D. Cal. General Order 20-05 (April 13, 2020); C.D. Cal. Amended General Order 20-08 (May 28, 2020); C.D. Cal. General Order 20-09 (August 6, 2020); C.D. Cal. General Order 21-03 (March 19, 2021).[3]

Each order was entered upon unanimous or majority votes of the district judges of the Central District with the stated purpose "to protect public health" and "to reduce the size of public gatherings and reduce unnecessary travel," consistent with the recommendations of public health authorities. C.D. Cal. General Order 20-02 at 1; C.D. Cal. General Order 20-05 at 1; C.D. Cal. Amended General Order 20-08 at 1; C.D. Cal. General Order 20-09 at 1. Most recently, on April 15, 2021, the Central District issued a general order explaining that jury trials will commence in the Southern Division, where the presiding judge in this action sits, on May 10, 2021. C.D. Cal. General Order 21-07.[4]

## B.

## 1.

Jeffrey Olsen, a California-licensed physician, is accused of illegally prescribing opioids. Following an

---

indicted before the suspension, the 180-day period does not apply, and he is subject to the ordinary Speedy Trial Act time limit.

[3] The General Orders are accessible at https://www.cacd.uscourts.gov/news/coronavirus-covid-19-guidance.

[4] The Central District of California includes the Western, Eastern and Southern divisions. At all relevant times, Olsen's case was based out of the Southern Division, located in Santa Ana, California.

investigation that began in January 2011, Olsen was indicted in July 2017 in the Central District of California on thirty-four counts related to illegal distribution of oxycodone, amphetamine salts, alprazolam, and hydrocodone, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), (b)(1)(E), and (b)(2), and furnishing false and fraudulent material information to the U.S. Drug Enforcement Administration in violation of 21 U.S.C. § 843(a)(4)(A). According to the government, Olsen was aware that at least two of his patients had died of prescription drug overdoses, while he continued prescribing dangerous combinations and unnecessary amounts of opioids to his patients.

Olsen made his initial appearance and was arraigned on July 11, 2017. Because the Speedy Trial Act required that Olsen's trial commence on or before September 19, 2017, the district court set trial for September 5, 2017. Olsen pleaded not guilty, and a magistrate judge set a $20,000 unsecured appearance bond; Olsen posted the bond and has since remained out of custody.

**2.**

Since Olsen's indictment and release on bond in 2017, there have been eight continuances of his trial date, which has postponed trial for over three years. The first five continuances were reached by stipulation with the government. Before the fifth stipulation, Olsen fired his retained counsel who had represented him since his initial appearance, and the district court appointed the Federal Public Defender as replacement counsel. These five stipulations continued Olsen's trial from September 5, 2017 to November 5, 2019. On August 20, 2019, Olsen sought a sixth continuance, which the district court granted over the government's objection, and continued Olsen's trial to May 5, 2020. After the court granted this continuance, the

COVID-19 pandemic hit the United States in March 2020. Thereafter Olsen obtained two more continuances via stipulations, which collectively continued his trial from May 5, 2020 to October 13, 2020.

On August 20, 2020, the district court held a status conference on Olsen's case. Olsen, for the first time, invoked his right to a speedy trial and expressed a desire to proceed with a jury trial on October 13, 2020. The government argued that an ends of justice continuance was appropriate due to the COVID-19 pandemic, the Central District's order suspending jury trials, and the absence of protocols to ensure the safety of jurors, witnesses, court staff, litigants, attorneys, defendants, and the public. The government also highlighted that it had objected to Olsen's request for a continuance a year earlier and had sought to proceed with trial in November 2019. In addition, the government noted, Olsen was out of detention, therefore diminishing any possible prejudice resulting from delay.

On August 28, 2020, the government formally moved to continue the trial from October 13, 2020 to December 1, 2020. The government argued that, given the Central District's suspension of jury trials and the lack of district-approved protocols to safely conduct a jury trial, the ends of justice served by a continuance outweighed the best interest of the public and Olsen in having a speedy trial. Olsen opposed the motion, and the district court denied it on September 2, 2020.

In denying the government's motion, the district judge made clear that, in his view, nothing short of trial impossibility could permit additional delay of Olsen's trial: "Continuances under the 'ends of justice' exception in the Speedy Trial Act are appropriate if without a continuance, holding the trial would be *impossible*" and "*actual*

*impossibility* is key for application of [the ends of justice] exception." The court concluded that the Constitution "requires that a trial only be continued over a defendant's objection if holding the trial is *impossible*" and that "[i]f it is possible for the court to conduct a jury trial, the court is constitutionally obligated to do so. There are no ifs or buts about it." Because, the district court reasoned, "it is simply not a physical or logistical impossibility to conduct a jury trial," a continuance was forbidden. The district court therefore requested the Chief Judge of the Central District to summon jurors for Olsen's trial. The Chief Judge promptly rejected this request and explained that the majority of the Central District judges had approved a general order to suspend jury trials as "necessary to protect the health and safety of prospective jurors, defendants, attorneys, and court personnel due to the [COVID-19] pandemic."

**3.**

On September 15, 2020, Olsen moved to dismiss his indictment with prejudice for violations of the Speedy Trial Act and Sixth Amendment. On October 14, 2020, the district court granted the motion. The district court's dismissal order was premised, again, on the theory that the court could not grant a continuance unless "holding [Olsen's] trial would be *impossible*." The district court stated:

> Given the constitutional importance of a jury trial to our democracy, a court cannot deny an accused his right to a jury trial *unless conducting one would be impossible*. This is true whether the United States is suffering through a national disaster, a terrorist attack, civil unrest, or the coronavirus pandemic that the country and the world are currently

> facing. Nowhere in the Constitution is there
> an exception for times of emergency or crisis.
> There are no ifs or buts about it.

In other words, nothing short of "*actual impossibility*" would do. Although, the court reasoned, the pandemic is "serious" and "[o]f course" posed a "public health risk," "it is simply not a physical or logistical impossibility to conduct a jury trial."

The district court observed that grand juries had convened in the federal courthouse and that the Orange County Superior Court, which is across the street from the Santa Ana Courthouse, had resumed jury trials with precautionary measures. "Clearly," the district court reasoned, "conducting a jury trial during this coronavirus pandemic is possible" and the Central District had therefore "[s]adly" denied Olsen his speedy-trial rights by suspending jury trials because they were "*unsafe*," but not "*impossible*." The court noted that "it is not a question of *if* the Court should have held Mr. Olsen's criminal jury trial during this stage of the coronavirus pandemic, but a question of *how* the Court should have held it." The court did not separately address Olsen's Sixth Amendment claim, finding that the analysis of that claim would parallel the Speedy Trial Act analysis.

As for the remedy, the district court dismissed Olsen's indictment with prejudice, pointing to the Central District's suspension of trials and refusal to summon jurors for Olsen's trial. The district court focused on the circumstances leading to dismissal and stated that the Chief Judge decided to suspend jury trials "knowingly and willfully" based on "the risk that people might get sick from the coronavirus," but "with little or no regard" for Olsen's speedy-trial rights. The court explained that "dismissing with prejudice is the only

sanction with enough teeth to create any hope of deterring additional delay in the resumption of jury trials and avoiding further dismissals of indictments," that dismissal without prejudice would let the government reindict "and proceed as if no constitutional violation ever occurred," and that this "meaningless result" would have "no adverse consequences" for the Central District.

Because the seventy-day Speedy Trial Act clock had not yet fully run, and no Speedy Trial Act violation had yet occurred, the court announced that the dismissal would "not take effect until October 28, 2020," when the Speedy Trial Act clock would expire.[5]  On that date, the district court entered a short order dismissing the indictment with prejudice and exonerating Olsen's bond.

### III.

### A.

We are asked to provide guidance on the application of the Speedy Trial Act's ends of justice provision, 18 U.S.C. § 3161(h)(7)(A), in the context of the challenges presented by the COVID-19 pandemic.  Olsen urges us to adopt the district court's reading of § 3161(h)(7)(A)—that "[c]ontinuances under the 'ends of justice' exception in the Speedy Trial Act are appropriate if without a continuance, holding the trial would be *impossible*."  We decline to do so.

---

[5] The parties do not dispute that the eight continuances in this case postponed Olsen's trial from September 5, 2017 to October 13, 2020. The district court's orders excluded this time from the calculation of the date by which Olsen's trial was required to commence.  Based on these exclusions, the seventy-day Speedy Trial Act period ran from July 11, 2017 to September 4, 2017 (fifty-five days) and from October 13, 2020 to October 29, 2020 (fifteen days).

At best, this is a strained reading of the Speedy Trial Act, and one without support from the text of the statute or our precedent.

In concluding that literal impossibility is the relevant standard for an ends of justice continuance, the district court evaluated only part of the first ends of justice factor: "[w]hether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding *impossible* . . . ." 18 U.S.C. § 3161(h)(7)(B)(i) (emphasis added). In support of this interpretation, Olsen points to two of our precedents evaluating the Speedy Trial Act's ends of justice provision. In *Furlow v. United States*, we noted that Mt. St. Helens had erupted two days before the defendant's trial, which "interrupted transportation, communication, etc. (affecting the abilities of jurors, witnesses, counsel, officials to attend the trial)." 644 F.2d at 767–68. Because of the logistical problems caused by the eruption, the district court continued the trial for two weeks past the prior Speedy Trial Act deadline under the ends of justice continuance provision. *Id.* Recognizing the "appreciable difficulty expected with an incident/accident of earth-shaking effect," we held that this "relatively brief" delay did not violate the Speedy Trial Act. *Id.* at 769.

Likewise, we found no Speedy Trial Act violation in *United States v. Paschall*, where the district court granted an eight-day ends of justice continuance of the Speedy Trial Act's charging deadline because the grand jury was unable to form a quorum due to a major snowstorm. 988 F.2d 972, 973–75 (9th Cir. 1993).[6] Specifically, we concluded that an

---

[6] *Paschall* addressed the time between arrest or service of summons and an indictment, which cannot exceed thirty days. *See* 18 U.S.C. § 3161(b). Olsen's case addresses the time between indictment or

ends of justice continuance was justified because the "interest of justice outweigh[ed] the public's and defendant's interest in a speedy trial" and "the inclement weather made the proceedings impossible." *Id.* at 975.

Contrary to Olsen's argument, nothing in *Furlow* or *Paschall* establishes a rule that an ends of justice continuance requires literal impossibility. In those cases, we simply affirmed ends of justice continuances because the eruption of a volcano and a major snowstorm temporarily impeded court operations. In other words, where it was temporarily impossible to conduct court proceedings for relatively brief periods, we found no Speedy Trial Act violation: but these cases do not stand for the proposition that a finding of impossibility is required in order to exclude time from the 70-day Speedy Trial Act clock. To be sure, the courts faced "appreciable difficulty" in proceeding to trial in *Furlow*, 644 F.2d at 769, and the inclement weather made grand jury proceedings temporarily "impossible" in *Paschall*, 988 F.2d at 975. But we never sanctioned the highly unusual result the district court reached here—that because the district court could physically hold a trial, it was required to deny the government's ends of justice continuance and dismiss Olsen's indictment with prejudice.[7]

---

arraignment and trial, which cannot exceed seventy days. *See id.* § 3161(c).

[7] Olsen's reliance on out-of-circuit caselaw fares no better. *See United States v. Hale*, 685 F.3d 522, 533–36 (5th Cir. 2012) (upholding an ends of justice continuance because a key witness was unavailable due to family emergency); *United States v. Richman*, 600 F.2d 286, 293–94 (1st Cir. 1979) (upholding an ends of justice continuance due to a blizzard); *United States v. Stallings*, 701 Fed. App'x. 164, 170–71 (3d Cir. 2017) (upholding an ends of justice continuance based in part on

A proper reading of 18 U.S.C. § 3161(h)(7)(B)(i) compels the opposite result. This provision directs the district court to consider "*[w]hether the failure to grant*" a continuance would make continuing the proceedings impossible. 18 U.S.C. § 3161(h)(7)(B)(i) (emphasis added). Because not granting the government's continuance meant that the Speedy Trial Act clock would necessarily expire before Olsen could be brought to trial, it follows that the district court's "failure to grant" an ends of justice continuance in this case *did* make "a continuation of [Olsen's] proceeding impossible." *Id.* The district court instead considered only whether it was physically impossible to hold a trial. Nothing in the Speedy Trial Act limits district courts to granting ends of justice continuances only when holding jury trials is impossible. *See id.* This is an unnecessarily inflexible interpretation of a provision meant to provide necessary flexibility to district courts to manage their criminal cases. *See Bloate v. United States*, 559 U.S. 196, 214 (2010) (citing *Zedner*, 547 U.S. at 498); *see also* S. Rep. No. 93–1021, 93d Cong., 2d Sess. 39 (1974) (noting that the ends of justice provision is "the heart of the speedy trial scheme" and provides for "necessary flexibility.").

In sum, the district court committed clear error by reading the word "impossible" from 18 U.S.C.

---

prosecutor's family emergency and scheduling conflicts); *United States v. Scott*, 245 Fed. App'x. 391, 393–94 (5th Cir. 2007) (upholding an ends of justice continuance based in part on Hurricane Katrina); *United States v. Correa*, 182 F. Supp. 2d 326, 327–29 (S.D.N.Y. 2001) (upholding an ends of justice continuance due to the September 11, 2001 terrorist attacks). There is nothing in any of these cases to support the unwarranted reading of trial impossibility into the ends of justice provision that the district court adopted and Olsen advocates here.

§ 3161(h)(7)(B)(i) in isolation.  This is enough for us to reverse.  *See Murillo*, 288 F.3d at 1133.[8]

## B.

By solely focusing on the word "impossible" in 18 U.S.C. § 3161(h)(7)(B)(i), the district court also overlooked the rest of the provision, which requires courts to ask whether the district court's failure to apply an ends of justice continuance "would . . . result in a miscarriage of justice."  We find the miscarriage-of-justice provision particularly salient in Olsen's case.

Olsen was indicted in July 2017 on thirty-four counts related to his prescribing dangerous combinations and unnecessary amounts of highly regulated pain medications, and was granted pretrial bond.  He then obtained eight trial continuances, including one over the government's objection, effectively delaying his trial for well over three years.  After the Central District suspended jury trials, Olsen insisted on sticking to his scheduled trial date.  By that time, the prosecution had been ready for trial for months and was wholly blameless for the Central District's suspension of jury trials.

The district court's failure to even mention these important facts in its dismissal order—especially the years of continuances while Olsen was on pre-trial release and the absence of any government culpability or minimal prejudice to Olsen—is troubling.  Olsen's argument, that the district court's finding that a trial was not impossible "implicitly"

---

[8] Because the basis for the district court's dismissal order was statutory only, we need not separately address Olsen's Sixth Amendment claim.

includes a finding that there would be no miscarriage of justice, is simply not convincing. We find no difficulty in concluding that the district court's failure to grant the government's motion and subsequent dismissal of Olsen's indictment, under the unique facts of Olsen's case and the Central District's suspension of jury trials, resulted in a miscarriage of justice. 18 U.S.C. § 3161(h)(7)(B)(i).

## C.

What is more, the district court failed to consider other, non-statutory factors. Section 3161(h)(7)(B) instructs district courts to consider a list of enumerated factors, "among others," in deciding whether to grant an ends of justice continuance. Although district courts have broad discretion to consider any factors based upon the specific facts of each case, we have reversed rulings where district courts have entirely failed to address relevant non-statutory considerations. *See, e.g.*, *United States v. Lloyd*, 125 F.3d 1263, 1269 (9th Cir. 1997) (finding the district court should have considered whether the parties "actually want[ed] and need[ed] a continuance, how long a delay [was] actually required, [and] what adjustments [could have been] made with respect to the trial calendars [to avoid a continuance]").

The Speedy Trial Act and our case law are silent as to what non-statutory factors district courts should generally consider. Nevertheless, in the context of the COVID-19 pandemic, we find relevant the following non-exhaustive factors: (1) whether a defendant is detained pending trial; (2) how long a defendant has been detained; (3) whether a defendant has invoked speedy trial rights since the case's inception; (4) whether a defendant, if detained, belongs to a population that is particularly susceptible to complications if infected with the virus; (5) the seriousness of the charges a defendant faces, and in particular whether the defendant is

accused of violent crimes; (6) whether there is a reason to suspect recidivism if the charges against the defendant are dismissed; and (7) whether the district court has the ability to safely conduct a trial.[9]

This non-exhaustive list, in the context of the pandemic, facilitates the proper balancing of whether the ends of justice served by granting a continuance outweigh the best interest of the public and the defendant in convening a speedy trial. *See* 18 U.S.C. § 3161(h)(7)(A); *see also United States v. Engstrom*, 7 F.3d 1423, 1426 (9th Cir. 1993) (noting that that the ends of justice provision promotes "an express balancing of the benefit to the public and defendant from a continuance with the costs imposed" of such a continuance). The record does not show that the district court considered any of these relevant factors. *See* 18 U.S.C. § 3161(h)(7)(A).

Finally, we note that Olsen's reliance on *United States v. Clymer*, 25 F.3d 824, 829 (9th Cir. 1994), is not helpful. It is true "that the ends of justice exclusion . . . was intended by Congress to be rarely used, and that the provision is not a general exclusion for every delay." *Clymer*, 25 F.3d at 828

---

[9] The district court's order questioned why the Central District of California conditioned its ability to hold jury trials on orders issued by the state government. *See Blueprint for a Safer Economy*, available at https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/ CaliforniaBlueprintDataCharts.aspx. Specifically, the district court observed that under California's *Blueprint*, certain essential sectors such as healthcare, emergency services, food, and energy were permitted to continue operations. This overlooks that the *Blueprint*'s color-coded tiers are premised on several factors that influence the risk of viral transmission, including ventilation in particular facilities, whether occupants of a facility can socially distance, and the duration of the gathering. The record in this case does not allow comparison between the federal district court in Santa Ana and nearby state courthouses based on the *Blueprint*'s risk factors.

(internal quotation marks and citations omitted); *see also* S. Rep. No. 93-1021, at 39, 41 (1974) (reflecting Congress's intent that ends of justice continuances "be given only in unusual cases" and "be rarely used").  But surely a global pandemic that has claimed more than half a million lives in this country, and nearly 60,000 in California alone, falls within such unique circumstances to permit a court to temporarily suspend jury trials in the interest of public health.[10]  In approving the Central District's declaration of judicial emergency, this Court's Judicial Council explained that "Congress did not intend that a district court demonstrate its inability to comply with the [Speedy Trial Act] by dismissing criminal cases and releasing would-be convicted criminals into society."  *See Judicial Emergency*, 955 F.3d at 1142–43.  That is precisely what the district court did here.

## IV.

While it is not necessary to our disposition of this case, we also find it important to briefly highlight the district court's additional error in dismissing Olsen's indictment

---

[10] Olsen repeatedly points to state courts in the Central District of California for his position that it is not impossible to conduct a jury trial safely.  But just because state courts are holding jury trials does not mean that they are necessarily holding them safely.  It is unknown whether jurors, witnesses, court staff, litigants, attorneys, and defendants are being subject to serious risks and illness.  Nothing in the record indicates that the Central District was able to hold a jury trial safely in October 2020, when Olsen's case was set for trial.  Indeed, at argument, Olsen's counsel could not point to anything in the district court's dismissal order or the record, aside from noting that the court would have utilized unidentified "similar safety precautions" to those state courts did, to adequately address these safety concerns.  The district court in fact acknowledged that even though it was possible to hold trials, there were significant health risks in doing so.

*with* prejudice. Although the district court recognized the charges against Olsen as "extremely serious," it nevertheless dismissed the indictment with prejudice, concluding that it was the only sanction that would have "enough teeth to create any hope of deterring additional delay in the resumption of jury trials."

We review the district court's decision to dismiss with or without prejudice for abuse of discretion. *United States v. Taylor*, 487 U.S. 326, 332 (1988). A court abuses its discretion if it "failed to consider all the factors relevant to the choice" and the "factors it did rely on were unsupported by factual findings or evidence in the record." *Id.* at 344. "In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: [(1)] the seriousness of the offense; [(2)] the facts and circumstances of the case which led to the dismissal; and [(3)] the impact of a reprosecution on the administration of [the Speedy Trial Act] and on the administration of justice." 18 U.S.C. § 3162(a)(2). A court's decision whether to dismiss the charges with or without prejudice depends on a "careful application" of these factors to each particular case. *Clymer*, 25 F.3d at 831.

Here, the district court failed to adequately consider all the relevant factors as applied to Olsen's case. *See Taylor*, 487 U.S. at 344. The district court primarily based its decision on the perceived need to deter the Central District from continuing its jury trial suspension. Olsen contends that the district court based its dismissal with prejudice on the factors of only "*this particular case*." The record shows otherwise. It appears that the only case-specific factor the court considered was the seriousness of Olsen's crimes, which it properly weighed against a dismissal with prejudice. *See United States v. Medina*, 524 F.3d 974, 986–

87 (9th Cir. 2008) (explaining that serious crimes weigh in favor of dismissal without prejudice). The remainder of the district judge's three-page analysis focuses only on the Central District's suspension of criminal jury trials and his disagreement with his colleagues' decision to vote in favor of suspension. Although the district judge characterized this analysis as the "facts and circumstances" that led to dismissal, the court entirely failed to consider the facts and circumstances of *Olsen's* case, including the years of continuances Olsen obtained while on pre-trial release and the absence of any prosecutorial culpability in causing the delay. *See United States v. Pena-Carrillo*, 46 F.3d 879, 882 (9th Cir. 1995) (looking for evidence of purposeful wrongdoing on part of prosecutor for this factor); *accord United States v. Stevenson*, 832 F.3d 412, 420 (3d Cir. 2016) (explaining that this factor considers whether the delay stemmed from "'intentional dilatory conduct' or a 'pattern of neglect on the part of the Government'") (quoting *United States v. Cano-Silva*, 402 F.3d 1031, 1036 (10th Cir. 2005)). The district court therefore committed legal error in failing to consider key factors relevant to Olsen's case: the absence of prosecutorial culpability and the multiple continuances requested by Olsen. *See Taylor*, 487 U.S. at 344.

The district court also committed legal error in evaluating the impact of reprosecution on the administration of the Speedy Trial Act and on the administration of justice. *See* 18 U.S.C. § 3162(a)(2). In dismissing Olsen's indictment with prejudice, the district court presumed that any adequate remedy must bar reprosecution. The district judge characterized dismissal with prejudice as "the only sanction with enough teeth to create any hope of deterring additional delay in the resumption of jury trials." The court explained that dismissal without prejudice would let the government reindict "and proceed as if no constitutional

violation ever occurred" and concluded that this would be a "meaningless result." This reasoning was incorrect. The Supreme Court has made clear that "[d]ismissal without prejudice is not a toothless sanction: it forces the Government to obtain a new indictment if it decides to reprosecute, and it exposes the prosecution to dismissal on statute of limitations grounds." *Taylor*, 487 U.S. at 342; *see also United States v. Newman*, 6 F.3d 623, 627 (9th Cir. 1993) (rejecting argument "that dismissal without prejudice renders the Speedy Trial Act meaningless"). Because the district court's ruling was based on an erroneous view of the law, it abused its discretion in dismissing with prejudice. *See United States v. Arpaio*, 951 F.3d 1001, 1005 (9th Cir. 2020).

## V.

We reverse the district court's dismissal of Olsen's indictment. The district court's interpretation of the Speedy Trial Act's ends of justice provision—that continuances are appropriate only if holding a criminal jury trial would be impossible—was incorrect. Nothing in the plain text of the Speedy Trial Act or our precedents supports this rigid interpretation.

We are, however, mindful that the right to a speedy and public jury trial provided by the Sixth Amendment is among the most important protections guaranteed by our Constitution, and it is not one that may be cast aside in times of uncertainty. *See Furlow*, 644 F.2d at 769 ("Except for the right of a fair trial before an impartial jury no mandate of our jurisprudence is more important"); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) ("[E]ven in a pandemic, the Constitution cannot be put away and forgotten.").

The Central District of California did not cast aside the Sixth Amendment when it entered its emergency orders suspending jury trials based on unprecedented public health and safety concerns. To the contrary, the orders make clear that the decision to pause jury trials and exclude time under the Speedy Trial Act was not made lightly. The orders acknowledge the importance of the right to a speedy and public trial both to criminal defendants and the broader public, and conclude that, considering the continued public health and safety issues posed by COVID-19, proceeding with such trials would risk the health and safety of those involved, including prospective jurors, defendants, attorneys, and court personnel. The pandemic is an extraordinary circumstance and reasonable minds may differ in how best to respond to it. The District Court here, however, simply misread the Speedy Trial Act's ends of justice provision in dismissing Olsen's indictment with prejudice.

**The judgment of the district court is REVERSED and REMANDED with instructions to reinstate Olsen's indictment, grant an appropriate ends of justice continuance, and set this case for a trial.**

---

MURGUIA, Chief Judge, and CHRISTEN, Circuit Judge, concurring in the denial of rehearing en banc:

"The correction of legal errors committed by the district courts is the function of the Court of Appeals . . . ." *Plotkin v. Pac. Tel. & Tel. Co.*, 688 F.2d 1291, 1293 (9th Cir. 1982). Here, the district court erred by denying the government's motion for an ends-of-justice continuance under the Speedy Trial Act based on a physical impossibility standard. That error required reversal. The dissent does not dispute that it

was error to dismiss the indictment against Dr. Olsen with prejudice. *See* Dissent at 93–94. That error separately required reversal. As a result, our panel reversed the district court's ruling and ordered that the serious charges against Olsen be reinstated on remand. *United States v. Olsen*, 995 F.3d 683, 686 (9th Cir. 2021). We did not predict or foreclose further Speedy Trial Act motions practice in this case. Because the district court clearly misinterpreted and misapplied the Speedy Trial Act, we stand firmly behind our opinion and concur with the denial of rehearing en banc.

## I.

The Sixth Amendment provides criminal defendants "the right to a speedy and public trial," U.S. CONST. amend. VI, but it does not outline how this right should be safeguarded. As a result, Congress enacted the Speedy Trial Act, setting specified time limits within which criminal trials must commence. Pub. L. No. 93-619, 88 Stat. 2076 (1975); *see Furlow v. United States*, 644 F.2d 764, 768–69 (9th Cir. 1981) (per curiam) (describing the Act as the Sixth Amendment's "implementation").

The Act requires that a criminal trial begin within seventy days from the date on which an indictment is filed, or the date on which the defendant makes an initial appearance, whichever occurs later. 18 U.S.C. § 3161(c)(1). The Act also details "periods of delay that are excluded in computing the time within which trial must start." *Zedner v. United States*, 547 U.S. 489, 497 (2006); *see* 18 U.S.C. § 3161(h). The Speedy Trial Act's ends-of-justice exception excludes from the seventy days "any period of delay . . . based on [the court's] findings that *the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial*." *Id.* § 3161(h)(7)(A) (emphasis added). In other words, the ends-of-justice

exception employs a balancing test. *See id.* The Act also requires courts to consider a non-exhaustive list of factors in determining whether to grant an ends-of-justice continuance. *See id.* § 3161(h)(7)(B). In Olsen's case, the most relevant factor was: "Whether the failure to grant such a continuance in the proceeding would be likely to make a continuance of such proceeding impossible, or result in a miscarriage of justice." *Id.* § 3161(h)(7)(B)(i).

## II.

In July 2017, Jeffrey Olsen, a physician, was indicted on thirty-four counts of unlawful distribution of opioids to his patients. Four of his patients died from apparently related drug overdoses. Olsen was arraigned in the Central District of California on July 11, 2017, and pleaded not guilty. The same day, the district court set a $20,000 unsecured appearance bond, scheduled his trial for September 5, 2017, and released Olsen. He has remained out of custody ever since.

Over a three-year period, the court continued Olsen's trial date eight times. The parties stipulated to seven of the continuances under § 3161(h)(7)'s ends-of-justice exclusion and the district court even granted Olsen's sixth continuance over the government's objection. After Olsen's sixth continuance, COVID-19 hit California. In response, the Central District issued the first of a series of emergency general orders based on national, state, and local public health emergency declarations, as well as the Centers for Disease Control and Prevention's ("CDC") recommendations for reducing exposure to the virus and slowing its spread. These orders included the Central District's declaration of a judicial emergency pursuant to 18 U.S.C. § 3174. *See In re Approval of Jud. Emergency Declared in the Cent. Dist. of Cal.*, 955 F.3d 1140, 1141 (9th

Cir. 2020). The dissent from denial of rehearing en banc makes no mention of the fact that the Circuit's Judicial Council reviewed the Central District's General Order, thereafter approving its declaration of a judicial emergency. *See id.* (in reference to the Central District's General Order suspending jury trials, the Judicial Council noted that the district court's chief judge "declared a thirty-day judicial emergency" by general order "pursuant to 18 U.S.C. § 3174(e). Finding no reasonably available remedy, the Judicial Council agreed to continue the judicial emergency for an additional one-year period and suspend the time limits of 18 U.S.C. § 3161(c).").

Most relevant here are the Central District's orders suspending all jury trials. Then-Chief Judge Virginia A. Phillips approved the suspension on March 13, 2020. That order was issued in the first uncertain days of the pandemic, and it observed that additional orders might follow. *See* Gen. Ord. 20-02. The General Order was later extended six times. *See* Gen. Ord. 20-05; Gen. Ord. 20-08; Gen. Ord. 20-09; Gen. Ord. 20-12; Gen. Ord. 20-15; Gen. Ord. 21-08. Each suspension order received unanimous or majority votes of the district judges "to protect public health" and "to reduce the size of public gatherings and reduce unnecessary travel," consistent with the recommendations of public health authorities. *See, e.g.*, Gen. Ord. 20-09. Following the filing of General Order 20-02 on March 17, 2020, Olsen stipulated to two additional continuances under the ends-of-justice exclusion.

Approximately two months before Olsen's trial date, the government expressed its intention to file an *ex parte* application for a continuance, similar to the request the district court granted Olsen prior to the pandemic. For the first time ever, the district court expressed its intention to

reject the ends-of-justice continuance request, making plain its sharp disagreement with the other judges in the Central District.

The trial judge's subsequent on-record comments reflect his discontent.  Indeed, the trial judge explicitly stated that he disagreed with the decision made by "the great majority of the judges" in the Central District to stay trials during the COVID-19 pandemic.  The district judge also made clear that he intended to enforce "*consequences to the judges in the Central District*."  In addition, the district judge's comments reflect his misapplication of the standard for determining whether an ends-of-justice continuance should be granted: "It's not an issue of balancing the constitutional right with the danger of conducting a jury trial," and "the way I look at it, *it's not a balancing test*."  The record memorializes that the district court's misguided motive for dismissing Olsen's indictment with prejudice was to force resolution of the trial judge's ongoing disagreement with the Central District's decision to suspend criminal jury trials due to the COVID-19 pandemic: "I think we have to use this case to try to expedite this issue for everybody's sake."

At the outset of the hearing on Olsen's motion to dismiss the indictment, the district court circulated a tentative order denying the motion without prejudice.  But after counsel clarified that the applicable extension of the statute of limitations would allow the government to re-file all counts, *see* 18 U.S.C. § 3288, the district court expressed doubt that dismissal without prejudice would have "*teeth*."

The court's written order stated that dismissal *with* prejudice: (1) "is the only sanction with enough teeth to create any hope of deterring additional delay in the resumption of jury trials and avoiding further dismissals of indictments," (2) would prevent the government from

reindicting "and proceed[ing] as if no constitutional violation ever occurred," and (3) would not be a "meaningless result" with "no adverse consequences [for] *the Central District*," unlike a dismissal without prejudice.

The order dismissing Olsen's indictment also explained that the court could not grant a continuance unless "holding the trial would be *impossible*," rather than the proper Speedy Trial Act standard allowing for an ends-of-justice continuance when "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial," 18 U.S.C. § 3161(h)(7)(A). Despite this sequence of events, the dissent argues that our panel erred in reversing the district court's dismissal.

On March 18, 2021, our panel reversed and remanded "with instructions to reinstate Olsen's indictment, grant an appropriate ends of justice continuance, and set the case for trial." *Olsen*, 995 F.3d at 695. We did not reach this conclusion lightly, nor did we foreclose future motions practice on Speedy Trial Act grounds. We were "mindful that the right to a speedy and public jury trial provided by the Sixth Amendment is among the most important protections guaranteed by our Constitution, and it is not one that may be cast aside in times of uncertainty." *Id.* Still, we could not ignore the district court's legally erroneous interpretation and application of the Speedy Trial Act, particularly its understanding that "nothing short of '*actual impossibility*'" could compel another ends-of-justice continuance in Olsen's case. *Id.* at 689–93. Nor could we overlook the manifest injustice that would result if these serious charges were dismissed, with prejudice, due to an internal dispute between the trial court judges serving in the Central District.

## III.

## A.

The dissent first asserts that "the applicable General Order here did *not* rest on a proper application of Speedy Trial Act standards."  Dissent at 77 (emphasis in original). Not only is this incorrect, the dissent misreads what it calls the "applicable General Order"—General Order 20-09—by considering it in a vacuum.  General Order 20-09 specifically found that "the increase in reported COVID-19 infections, hospitalizations, and deaths serve[d] the ends of justice and outweigh[ed] the interests of the public and the defendants in a speedy trial."  Gen. Ord. 20-09 at 3.  Therefore, applying the correct standard set forth in 18 U.S.C. § 3161(h)(7)(A), the majority of district court judges in the Central District were persuaded that the ends of justice outweighed the best interest of the public and the defendant in a speedy trial due to the COVID-19 pandemic.[1]

Our opinion noted that the Central District of California's emergency general orders clearly applied the Speedy Trial Act standard:

> The Central District of California did not cast aside the Sixth Amendment when it entered its emergency orders suspending jury trials based on unprecedented public health and safety concerns.  To the contrary, the orders make clear that the decision to pause jury trials and exclude time under the Speedy

---

[1] The purpose of a general order is to regulate court operations. Here, a majority of federal judges in the Central District agreed that the general orders were the best response to the burgeoning health and safety risks presented by the pandemic.

Trial Act was not made lightly. The orders acknowledge the importance of the right to a speedy and public trial both to criminal defendants and the broader public, and conclude that, considering the continued public health and safety issues posed by COVID-19, proceeding with such trials would risk the health and safety of those involved, including prospective jurors, defendants, attorneys, and court personnel.

*Id.* at 695.

The dissent only quotes a subsection of General Order 20-09's Speedy Trial analysis and alleges that the order "mere[ly] recit[es]" the Speedy Trial Act's "ultimate standard." Dissent at 77–78. Not so. General Order 20-09 details an increase in COVID-19 infections and deaths, as well as CDC guidance related to in-person gatherings to support its conclusion that the balance weighed in favor of continuing jury trials in the Central District. Gen. Ord. 20-09 at 1–3.

Moreover, the unprecedented danger to health and safety presented by the pandemic, particularly in its earlier days when Olsen sought to try his case, cannot be overstated. The dissent opines that the majority held, "to justify a continuance, it was sufficient that the General Order simply cited the 'risk' to 'health and safety . . . .'" Dissent at 83 (quoting *Olsen*, 995 F.3d at 695). But our opinion acknowledged that the Central District's broad continuation of jury trials was triggered by "a global pandemic that ha[d] claimed more than half a million lives in this country, and nearly 60,000 in California alone [at the time of our opinion]." *Olsen*, 995 F.3d at 693. The dissent, in hindsight, attempts to support its argument by diminishing the severity

of the pandemic during this time, but the numbers speak for themselves.

The dissent next argues that, by allowing General Order 20-09 "to serve as the source of the impossibility that justifies a continuance," our analysis rested "on a bootstrap argument that permits a wholesale evasion of the impossibility standard." Dissent at 76. Again, this is not so. The Speedy Trial Act directs the district court to consider "*[w]hether the failure to grant* such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice." 18 U.S.C. § 3161(h)(7)(B)(i) (emphasis added). A basic premise the district court and dissent both miss is that the question presented was whether the *failure to grant* a continuance would make it impossible to continue trial. The district court misinterpreted this factor, believing it asks whether holding trial is physically possible. Section 3161(h)(7)(A) required the district court to *ultimately* decide whether the public's and Olsen's interests in a speedy trial were outweighed by the need for the continuance; in this case, a continuation of jury trials due to pervasive COVID-19 infections and deaths. Accordingly, as noted in our opinion, because not granting the government's continuance rendered trial impossible due to General Order 20-09's suspension of criminal jury trials in light of the pandemic, Section 3161(h)(7)(A) required the district court to balance competing interests and decide whether the public's and Olsen's interests in a speedy trial outweighed the COVID-19-inspired need for the continuance. *Id.* § 3161(h)(7)(A). Though the dissent from the denial of rehearing en banc obliquely suggests the Central District's General Orders are the issue, the question presented to our panel was whether the district court misinterpreted the Speedy Trial Act to require that trials go forward if it is physically possible to

conduct them, rather than requiring a balancing of factors. The answer was plainly yes.

In addition to misreading the Speedy Trial Act, the dissent misreads our case law—principally *Furlow v. United States*, 644 F.2d 764 (9th Cir. 1981) (per curiam), and *United States v. Paschall*, 988 F.2d 972 (9th Cir. 1993)—as support for the district court's conclusion that ends-of-justice continuances may only be granted when a trial court finds it physically impossible to hold trial. *See* Dissent at 82. But *Furlow* and *Paschall* provide no support for the dissent's view. In these two cases, natural disasters made compliance with the Speedy Trial Act deadlines practically impossible, but we have never said that a finding of physical impossibility is a prerequisite to granting an ends-of-justice continuance.[2] Such an interpretation contradicts the plain language of the Speedy Trial Act, which expressly requires that courts consider several factors. 18 U.S.C. § 3161(h)(7)(B).

The dissent's reading of the Speedy Trial Act also defies case law indicating that other considerations may warrant a continuance. *See, e.g.*, *United States v. Apperson*, 441 F.3d 1162, 1180 (10th Cir. 2006) (granting a brief continuance to allow government counsel time to prepare in order to avoid a "miscarriage of justice"); *United States v. Hill*, 197 F.3d 436, 441–43 (10th Cir. 1999) (holding that the "miscarriage of justice" exception was properly applied where the government would otherwise be forced to go to trial without

---

[2] *Paschall* noted the impossibility factor in its reasoning for granting an ends-of-justice continuance, but it did not assert that this factor was necessary or sufficient on its own, only that it was "relevant to the present case." *Paschall*, 988 F.2d at 975. And *Furlow* made no mention of impossibility whatsoever.

a key witness and without adequate time to effectively prepare).

The district court was required to weigh the logistical problems and public health risks caused by COVID-19, among other factors, in balancing whether the ends of justice served by continuing trial outweighed the best interest of the public and the defendant in a speedy trial. Accordingly, though it is true that Orange County Superior Court resumed operations during the pandemic, it is just as true that tens of thousands of people have contracted COVID-19—and thousands have died.[3] The district court was required to

---

[3] We did not "shift[] the burden of proof on the issue of impossibility . . . from the Government to Olsen" in stating that, "just because the state courts are holding jury trials does not mean that they are necessarily holding them safely." Dissent at 87 (citing *Olsen*, 995 F.3d at 693 n.10). Without record support, the district court announced that it was possible to move forward with trial, apparently because at least some state court trials were going forward. The record makes clear that the district court had made up its mind, despite the government's showing that the General Orders, approved by the Circuit Council, prevented jury trials. This does not "necessarily mean[] that the party who had the burden of proof failed to carry it." Dissent at 88. It instead means that, when weighing the relevant factors, the Central District was likely unconvinced or uncertain that the safety protocols instituted by state courts were effective enough to combat the spread of COVID-19, particularly given the novelty of the virus at the time. As the dissent concedes, the "ultimate standard" for granting an ends-of-justice continuance under the Speedy Trial Act involves a balancing test. Dissent at 78; *see also* 18 U.S.C. § 3161(h)(7)(A). The Central District cannot be faulted for reaching a conclusion that is contrary to what the dissent would have desired when deciding how best to protect its citizens during a once-in-a-lifetime pandemic.

It is far from clear that Orange County conducted operations safely. The Los Angeles Times has since reported that four interpreters from the Los Angeles County courthouse died from COVID-19. Matt Hamilton, *State Fines L.A. County Superior Court for Safety Violations during*

balance these realities to determine whether the ends of justice would be served by a continuance under the Speedy Trial Act rather than simply ending its analysis after it decided that holding trial would be physically possible. *See* 18 U.S.C. § 3161(h)(7)(B)(i)–(iv).

The dissent also asserts that we did not "articulate or apply any standard" for determining whether a trial was "impossible." Dissent at 80. This overlooks our discussion clarifying that the outcomes in *Furlow* and *Paschall* did not

---

*COVID-19 Pandemic*, LOS ANGELES TIMES (July 7, 2021), https://www.latimes.com/california/story/2021-07-07/state-issues-25-000-fine-to-l-a-superior-court-for-safety-violations-during-pandemic (reporting that "at least four people who worked in Los Angeles County courthouse" died due to COVID-19). Orange County has confirmed 336,476 COVID-19 cases to date—an increase of more than 85,000 since the *Olsen* panel heard argument in March 2021—and has registered 5,852 deaths—an increase of nearly 2,000. *See* Los Angeles Times Staff, *Tracking the Coronavirus in California*, LOS ANGELES TIMES, https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/ (last visited Dec. 21, 2021).

The number of cases and deaths continue to increase at alarming levels in the counties within the Central District. To date, San Bernardino has seen 385,830 cases and reported 6,023 deaths; Riverside: 398,957 cases and 5,452 deaths; San Luis Obispo: 32,429 cases and 366 deaths; Santa Barbara: 48,861 cases and 562 deaths; Ventura: 106,809 cases and 1,203 deaths; and finally, Los Angeles: 1,555,065 cases and 27,189 deaths. As of today's date, 2,864,427 citizens in the Central District have tested positive for some COVID-19 variant, and 46,647 of those citizens have died as a result. The Central District accounts for *more than half* of all COVID-19 cases and deaths in California: 5,204,641 Californians have tested positive, and 75,167 have died. Los Angeles Times Staff, *Tracking the Coronavirus in California*, LOS ANGELES TIMES, https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/ (last visited Dec. 21, 2021); *see also* TRACKING COVID-19 IN CALIFORNIA, CALIFORNIA, ALL, https://covid19.ca.gov/state-dashboard/ (last visited Dec. 21, 2021).

depend on a finding of physical impossibility. *See Olsen*, 995 F.3d at 690–91 (discussing *Furlow*, 644 F.2d at 767; *Paschall*, 988 F.2d at 975. Though we did not attempt to define and anticipate every circumstance in which a continuance may outweigh the public's and defendant's interests in a speedy trial, we suggested a list of non-statutory factors to assist district courts in addressing future motions. *Id*. at 690. Some of these factors may aid in determining whether conducting trial would be physically possible, others facilitate "the proper balancing of whether the ends of justice served by granting a continuance outweigh the best interest of the public and the defendant in convening a speedy trial." *Id.* at 693. Consistent with the required balancing test, we sought to suggest guiding principles for assessing the impossibility factor rather than a hardline standard.

## B.

The dissent contends that the miscarriage of justice provision does not apply when an indictment is dismissed for failure to conduct a timely trial. *See* Dissent at 89–90. But in enacting the Speedy Trial Act, Congress specifically noted that the dismissal of a criminal indictment on speedy trial grounds may constitute a miscarriage of justice under the Act. *See* H.R. Rep. No. 93-1508, *reprinted in* 1974 U.S.C.C.A.N. 7401, 7436. And the 1974 House Committee Report makes clear that the judicial emergency provision § 3174 was adopted because the Committee did not wish to leave the possibility of unjustifiable dismissals to chance:

> [B]ecause of the unique circumstance in which the Congress has placed the courts by enacting speedy trial legislation without providing advanced [*sic*] increases in resources*, it is also providing the courts with*

> *a tool that would permit them enough flexibility to prevent a **miscarriage of justice** by dismissing the indictments or informations against potential criminals because of circumstances beyond the control of an individual court.*"

*In re Approval of Jud. Emergency Declared in Dist. of Ariz.*, 639 F.3d 970, 980 (9th Cir. 2011) (emphasis added) (quoting 1974 U.S.C.C.A.N. 7401, 7436).

This Circuit's Judicial Council has treated the miscarriage of justice exception the same way. The Judicial Council's opinion, *In re Approval of Judicial Emergency Declared in District of Arizona*, ratified a one-year extension of judicial emergency, suspending the Speedy Trial Act's seventy-day time limit. *Id.* at 971. The Judicial Council observed that "Congress did not intend that a district court demonstrate its inability to comply with the [Speedy Trial Act] by dismissing criminal cases and releasing would-be convicted criminals into society." *Id.* at 972 (citing 1974 U.S.C.C.A.N. 7401). The Judicial Council also observed: "[T]he emergency provision ha[d] been used twice previously to avoid imminent criminal dismissals as a sanction for non-compliance." *Id.* (first citing *United States v. Bilsky,* 664 F.2d 613, 619–20 (6th Cir. 1981)); then citing *United States v. Rodriguez–Restrepo,* 680 F.2d 920, 921 n.1 (2d Cir. 1982)). Given this Circuit precedent, it is peculiar that the dissent so steadfastly claims jury trials may not be extended under the Speedy Trial Act by general order, particularly in times of exceptional crisis pursuant to 18 U.S.C. § 3174.

The dissent attempts to distinguish Olsen's case by noting, as we did in our opinion, that Olsen's indictment preceded the Central District's declaration of judicial

emergency. *See* Dissent n. 19 (citing *Olsen*, 995 F.3d at 687 n.2). But as we explained, the timing of Olsen's indictment meant only that he was subject to the 70-day Speedy Trial Act clock rather than the 180-day period instituted during the judicial emergency. *Olsen*, 995 F.3d at 687 n.2. Notwithstanding the general timing of Olsen's Speedy Trial Act clock, Olsen's case was before the Central District of California, and the Central District had declared a judicial emergency. In fact, following the declaration of judicial emergency, Olsen obtained continuances under the ends-of-justice exclusion, citing the COVID-19 pandemic and the judicial emergency as reasons for the continuances. Thus, Olsen invoked the Central District's judicial emergency when it worked to his benefit, and the dissent acknowledged that the Central District's emergency general orders applied to Olsen. Yet the dissent goes on to take a starkly inconsistent position by arguing that the Central District's judicial emergency did not apply to Olsen when it discusses whether the dismissal of his indictment constituted a miscarriage of justice.

## C.

Finally, the dissent alleges that we watered down the Speedy Trial Act by enumerating our own set of "*non-statutory* factors" the district court should have considered. Dissent at 84. This is a serious misreading of our opinion. Rather than faulting the district court for failing to consider the factors we identified, we took issue with the court's failure to consider *any* relevant non-statutory factors. We found relevant certain non-exhaustive considerations in the context of the COVID-19 pandemic, *Olsen*, 995 F.3d 693, and identified them because "[t]he Speedy Trial Act and our case law are silent as to what non-statutory factors district courts should generally consider," *id.* at 692. By suggesting

factors trial courts may consider during this pandemic—including whether the defendant is incarcerated while awaiting trial—we did not rewrite the statutory factors in order to "evade their limits," as the dissent asserts. Dissent at 84. Indeed, in their briefs to the district court, the government and Olsen argued other unenumerated factors gleaned from other Speedy Trial Act cases. *See United States v. Loud Hawk*, 474 U.S. 302, 311 (1986); *United States v. Harris*, No. 2:20-CR-00049, 2020 WL 2539321, at *3 (E.D. Cal. May 19, 2020); *United States v. Smith*, No. 2:19-CR-00213, 2020 WL 2541713 (E.D. Cal. May 19, 2020)). Our opinion simply anticipated that many similar cases will be presented as the pandemic wears on and offered guidance for district courts to consider.

The dissent argues that we solely relied on the seventh factor (i.e., whether the district court had the ability to safely conduct trial). *See* Dissent at 85. Our opinion says otherwise. It explains that Olsen posted bond and has remained out of custody since his initial appearance on July 11, 2017, so he was not detained pending trial and was not detained for a significant period of time (addressing the first and second factors). *Olsen*, 995 F.3d at 688. We noted there had been eight continuances of Olsen's trial date, seven of which were reached by stipulation with the government, so he had not invoked his speedy trial rights since the case's inception (noting the third factor). *Id.* We explained that Olsen's charges are extremely serious: he is a physician accused of illegally prescribing opioids that allegedly led to the deaths of four patients (invoking the fifth factor). *Id.* at 688–89.

With respect to the seventh factor, the dissent acknowledges that, "[i]n ordinary usage, the term 'impossible' has a range of meanings that extend from

'incapable of being or of occurring' . . . to 'extremely and almost insuperably difficult under the circumstances.'" Dissent at 81 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1136 (1981)). Nevertheless, the dissent takes issue with considering the safety of the public, court staff, and counsel in an impossibility analysis. *See* Dissent at 81–82. Consistent with *Paschall* and *Furlow*, if conducting trial is "extremely and almost insuperably difficult" due to health and safety concerns, this may counsel in favor of continuing trial.

## IV.

Our panel was tasked with deciding whether the district court erred by denying the government's motion for an ends-of-justice continuance, and dismissing the defendant's case with prejudice pursuant to 18 U.S.C. § 3161(h)(7)(B) based on its conclusion that it would be possible to hold trial, even if doing so posed public health risks. Nothing in our opinion minimizes the importance of the constitutionally guaranteed right to a speedy trial, and we will surely be presented with future cases in which the balancing required by the Speedy Trial Act will present different results.

The COVID-19 pandemic presents a once-in-a-lifetime catastrophe that has unfortunately endured for months, causing fear and trepidation, serious illness and injury— from which some will never fully recover—and worst of all, national and worldwide fatalities. The Central District has been one of the hardest hit areas in our country. In *Olsen*, we acknowledged the continuing health and safety issues the COVID-19 pandemic presents, while simultaneously balancing the rights of the accused. The district court's dismissal of the serious charges in this case with prejudice aimed to enforce "*consequences to the judges in the Central*

*District*" rather than apply the balancing required by the Speedy Trial Act. Because the district court misapplied the standard for an ends-of-justice continuance, we stand behind our opinion and concur with the denial of rehearing en banc.

---

BUMATAY, Circuit Judge, concurring in the denial of rehearing en banc:

These are trying times. The COVID-19 pandemic has forced our nation and our courts to confront novel, difficult issues. In response to COVID-19, governments at all levels have enacted measures to mitigate the spread of the deadly virus. Some of these measures have tested the limits of the Constitution. But "[e]ven in times of crisis," judges must "not shrink from our duty to safeguard th[e] rights" guaranteed by the Constitution. *Tandon v. Newsom*, 992 F.3d 916, 939 (9th Cir. 2021) (Bumatay, J., dissenting in part and concurring in part). The Supreme Court has instructed us time and again that our constitutional rights are entitled to the utmost protection—even in a pandemic. Thus, we never "water[] down" our examination of alleged constitutional infringements and must always uphold that the Constitution "really means what it says." *Tandon v. Newsom*, 141 S. Ct. 1294, 1298 (2021) (simplified). And courts cannot punt on vigorously enforcing the protections of the Constitution because we are grappling with an unquestionably serious crisis. So we must always undertake an exacting look at actions that may violate a constitutional right.

This case falls into the category of difficult matters borne out of the COVID-19 pandemic. Last year, the federal district court in Los Angeles, California indefinitely suspended trials because of COVID-19. Jeffrey Olsen, a defendant out on bail, invoked his speedy trial rights. After

the government requested a two-month continuance of his trial, the district court declared a violation of the Speedy Trial Act and the Speedy Trial Clause of the Constitution. What's more, the district court dismissed the charges against Olsen with prejudice. Our court reversed on statutory grounds.

So this case requires us to look to the meaning of our sacred right to a speedy trial as guaranteed by the Sixth Amendment and see what leeway, if any, the Speedy Trial Act grants in the face of COVID-19. While the matter poses some troubling circumstances, Olsen's constitutional speedy trial right was not violated. At its core, the Speedy Trial Clause ensures that defendants are not locked up in jail indefinitely pending trial. This enforces the guarantee against arbitrary detention. But since Olsen wasn't detained pretrial and the delay here was not long enough to justify dismissal according to our precedent, no violation occurred. That said, this case would be *much different* if Olsen had been incarcerated during the COVID-19 pandemic and did not receive the trial he was entitled to under the Constitution. In that situation, the constitutional analysis would be significantly different in my view. And while I would quibble with the court's statutory analysis, I agree that the Speedy Trial Act does not dictate dismissal here.

For these reasons, I concur with the denial of rehearing en banc.

## I.

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. Const. amend. VI. As the Supreme Court recognized, "the right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment." *Klopfer v. North Carolina*, 386 U.S. 213, 223

(1967). While the Speedy Trial Clause stands among our most sacred safeguards of individual liberty, its full meaning is less clear. It has been described as both "fundamental" and "amorphous"; both "mechanical" and "slippery."[1]

The full contours of the right may be unresolved, but the text and history of the Speedy Trial Clause establish an enduring principle: the primary guarantee of the right is to protect against prolonged *pretrial detention* by the government. Olsen was on bail pretrial and, while the indefinite suspension of jury trials is disconcerting, the trial delay doesn't appear to offend the core right as established by the Sixth Amendment.[2]

## A.

Like most of our rights, the right to a speedy trial is rooted in English legal tradition. The earliest known expression of the speedy trial right comes from the Assize of

---

[1] *See* Alfredo Garcia, The Sixth Amendment in Modern American Jurisprudence 157 (1992) (simplified); George C. Thomas III, *When Constitutional Worlds Collide: Resurrecting the Framers' Bill of Rights and Criminal Procedure*, 100 Mich. L. Rev. 145, 153–54 (2001).

[2] The panel neglected to analyze Olsen's Speedy Trial Clause claim even though the district court's dismissal also hinged on a constitutional violation. *See United States v. Olsen*, 995 F.3d 683, 691 n.8 (9th Cir. 2021). That was a mistake. What satisfies the Speedy Trial Act may still violate the Sixth Amendment, and vice versa. *See United States v. Thirion*, 813 F.2d 146, 154 (8th Cir. 1987) ("Sixth amendment challenges receive separate review distinct from the Speedy Trial Act."); *United States v. Gonzalez,* 671 F.2d 441, 442 (11th Cir. 1982) ("The rights of criminal defendants under the Speedy Trial Act and the sixth amendment are distinct[.]"); *United States v. Bilsky*, 664 F.2d 613, 617 (6th Cir. 1981) (There is a "critical difference . . . between the dismissals available under the Speedy Trial Act and the Supreme Court interpretations [of the Sixth Amendment right].").

Clarendon of 1166—King Henry II's attempt to establish rudimentary rules for criminal procedure.[3] The fourth provision of the Assize provided:

> And when a robber or murderer or thief, or harbourers of them, shall be taken on the aforesaid oath, if the Justices shall not be about to come quickly enough into that county where they have been taken, the sheriffs shall send word to the nearest Justice through some intelligent man, that they have taken such men; and the Justices shall send back word to the sheriffs where they wish those men to be brought before them: and the sheriffs shall bring them before the Justices. And . . . there, before the Justice, they shall do their law.[4]

The Assize thus established a prisoner's right to be brought promptly before a judge and have his case heard. And if no royal judge was readily available in the county, the sheriffs had to bring the prisoner elsewhere.

Almost fifty years later, in 1215, King John codified the right in the Magna Carta—the seminal charter of English rights. The charter guaranteed that "[w]e will sell to no man,

---

[3] Patrick Ellard, Learning from Katrina: Emphasizing the Right to a Speedy Trial to Protect Constitutional Guarantees in Disasters, 44 Am. Crim. L. Rev. 1207, 1209 (2007).

[4] Assize of Clarendon, 1166 ¶ 4, available at https://avalon.law.yale.edu/medieval/assizecl.asp.

we will not deny or defer to any man either justice or right."[5]
To Sir Edward Coke, these words meant:

> [E]very subject of th[e] realme, for injury
> done to him . . . , be he ecclesiasticall, or
> temporall, free, or bond, man, or woman, old,
> or    young,    or    be    he    outlawed,
> excommunicated,   or   any   other   without
> exception, may take his remedy by the course
> of the law, and have justice, and right for the
> injury done to him, freely without sale, fully
> without any deniall, and speedily without
> delay.[6]

To keep this right, the king dispatched judges to each
county of the kingdom with the duty to administer justice for
each jailed prisoner "according to the rule of law and
custome of England."[7]  By arriving in each county at least
twice a year, royal judges ensured that they "have not
suffered the prisoner to be long detained, but at their next
comming have given the prisoner full and speedy justice, by
due triall, without detaining him long in prison."[8]  Any
infringement of the prohibition against long detention
without "lawfull deliverance" would lead to the forfeiture of

---

[5]  Magna Carta, 1215 c. 40, as translated by Edward Coke, The
Second Part of the Institutes of the Laws of England 45 (London, Clarke
& Sons, 1817).

[6]  Coke, *supra* note 5 at 55.  The primary "injury" in this context was
"false imprisonment" and other pre-Magna Carta abuses that prevented
prisoners from challenging their detention.  *See id.* at 52–55.

[7] *Id.* at 56 (describing the commissions of gaol delivery and oyer and
terminer)

[8] *Id.* at 42.

the jail to the king.[9]   Coke noted that one of the primary concerns for the law was that "the innocent shall not be worn and wasted by long imprisonment, but . . . speedily come to his triall."[10]   To him, "speedy" justice meant criminal proceedings without prolonged pretrial detention.

The Habeas Corpus Act of 1679, 31 Car. 2, c. 2 (Eng.), another historical predecessor of the speedy trial right,[11] further reinforced the established right against unreasonable pretrial detentions.   Parliament passed the Act after the restoration of Charles II to prevent executive abuses, including the long imprisonment of the Crown's enemies without indictment.[12]   The Act addressed "great delays" by jailers "in making Returns to Writts of Habeas Corpus" and sought to remedy the concern that "many of the Kings Subjects have beene and hereafter may be long detained in Prison," when they could have been released on bail.[13]

---

[9] *Id*.

[10] *Id*. at 315.

[11] In 1851, the General Court of Virginia characterized the speedy trial right as the "re-affirmance of a principle declared and consecrated by the famous" Habeas Corpus Act. *Commonwealth v. Adcock*, 49 Va. 661, 676 (Va. Gen. Ct. 1851).   At the time, the General Court was Virginia's supreme criminal tribunal.   *See* Jurisdiction Information, Library of Virginia, at https://www.lva.virginia.gov/public/guides/burned_juris/Jurisdiction_info.htm.

[12] Amanda L. Tyler, A "Second Magna Carta": The English Habeas Corpus Act and the Statutory Origins of the Habeas Privilege, 91 Notre Dame L. Rev. 1949, 1976 (2016); *see also* Alan L. Schneider, Note, The Right to a Speedy Trial, 20 Stan. L. Rev. 476, 483 (1968).

[13] Tyler, *supra* note 12, at 1976.

The Act established timelines for the indictment and trial of prisoners and penalties for the failure to adhere to the requirements.  Such mandates were "[f]or the prevention whereof and the more speedy Releife of all persons imprisoned for any such criminall or supposed criminall Matters."[14]  In particular, for those persons jailed for "High Treason or Fellony," the Act generally required an indictment within two court terms (a term typically only spanning three-to-six months) or for the prisoner to be "sett at Liberty . . . upon Baile."[15]  The Act then mandated that a prisoner not indicted and tried by the third term "shall be discharged from his Imprisonment."[16]

In 1765, William Blackstone wrote that English law commanded that "no subject of England can be long detained in prison, except in those cases in which the law requires and justifies such detainer."[17]  Like Coke, Blackstone noted that royal judges traveled to each county in the kingdom to render judgment to every prisoner in the jails, "whenever indicted, or for whatever crime committed."[18]  The judges arrived twice every year throughout the kingdom, except for the "four northern" counties where it was held only once a year, and for London

---

[14] *Id.* at 1976.

[15] *Id.* at 1978 (quoting Habeas Corpus Act of 1679 § 7).

[16] *Id*.

[17] 1 Commentaries on the Laws of England 131 (1st ed. 1765) ("Blackstone").

[18] 4 Blackstone 267 (1st ed. 1769).

and Middlesex where it was held eight times a year.[19] So "one way or other, the [jails] are cleared, and all offenders tried, punished, or delivered, twice in every year[.]"[20] Trials could occur with even greater expediency, when, "upon urgent occasions, the king issues a special or extraordinary commission . . . , confined to those offenses which stand in need of immediate inquiry and punishment[.]"[21] But Blackstone observed that at least twice a year, prisoners would be tried or released—setting a general outer limit for pretrial detention. For Blackstone, this right was the "bulwark of [the British] constitution."[22]

## B.

It was this core right against prolonged pretrial detention that took hold and flourished in the United States. Several of the colonial States adopted speedy trial provisions in their state constitutions and either adopted the Habeas Corpus Act itself or enacted similar laws. *See Klopfer*, 386 U.S. at 225 n.21 (citing the constitutions of Delaware, Maryland, Pennsylvania, and Virginia); *Petition of Provoo*, 17 F.R.D. 183, 197 n.6 (D. Md. 1955) (collecting habeas laws). Given that many Founders studied Coke's writings, the constitutional expression of the right echoed his formulation. *Klopfer*, 386 U.S. at 226 (noting that Coke's Institutes was "the universal elementary book of law students," widely read by law students in the American colonies including Thomas Jefferson, John Rutledge, and George Mason). For example,

---

[19] 4 Blackstone 266.

[20] 4 Blackstone 267.

[21] 4 Blackstone 267.

[22] 4 Blackstone 431.

the Virginia Declaration of Rights, the first colonial bill of rights, guaranteed "[i]n all capital or criminal prosecutions . . . a right to a speedy trial." *Id.* at 225 (simplified).

Of course, and most importantly for us, the People ratified the "right to a speedy . . . trial" as part of the Sixth Amendment. U.S. Const. amend. VI. As a delegate to the Massachusetts ratifying convention, Abraham Holmes, observed that the right would protect against a person being

> dragged from his home, his friends, his acquaintance, and confined in prison, until the next session of the court, . . . and after long, tedious, and painful imprisonment, though acquitted on trial, may have no possibility to obtain any kind of satisfaction for the loss of his liberty, the loss of his time, great expenses, and perhaps cruel sufferings.[23]

Thus, "[t]he history of the right to a speedy trial and its reception in this country clearly establish that it is one of the most basic rights preserved by our Constitution." *Klopfer*, 386 U.S. at 226.[24]

---

[23] 2 Jonathan Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution as Recommended by the General Convention at Philadelphia in 1787 110 (2d ed. 1891).

[24] Commentators agree that there's a relative "paucity" of historical data surrounding the Founders' adoption of the speedy trial right. Schneider, *supra* note 12, at 484; *see also United States v. Marion*, 404 U.S. 307, 315 n.6 (1971) (describing historical evidence surrounding the ratification of the Speedy Trial Clause as "meager"). Perhaps, this reflects the widespread understanding of the common law right as taught by Coke, Blackstone, and other Founding-era sources.

Despite this storied history, surprisingly few Founding-era cases illuminate the full meaning and scope of the speedy trial right. But one of the most notorious cases of the Founding era did inform the understanding of the right. Presiding over the arrest and imprisonment of Aaron Burr for treason, Chief Justice Marshall determined Burr was entitled to compulsory process before his indictment. *United States v. Burr*, 25 F. Cas. 30, 33 (C.C.D. Va. 1807). In making that decision, he considered how the speedy trial right informed the issue:

> The right given by this article must be deemed sacred by the courts, and the article should be so construed as to be something more than a dead letter. What can more effectually elude the right to a speedy trial than the declaration that the accused shall be disabled from preparing for it until an indictment shall be found against him? It is certainly much more in the true spirit of the provision which secures to the accused a speedy trial, that he should have the benefit of the provision which entitles him to compulsory process as soon as he is brought into court.

*Id*. Chief Justice Marshall then concluded that "withholding from a prisoner the process of the court" would lead to delays, "which are never desirable, which frequently occasion loss of testimony, and which are often oppressive." *Id.* at 32.

Several early federal and state cases also raised the concern of lengthy pretrial detention. For example, in 1807, a Tennessee court held that the right to a speedy trial mandated the discharge of a prisoner because the resignation

of the prosecutor was "no ground to keep the prisoner six months longer in confinement." *State v. Sims*, 1 Tenn. 253, 253 (Tenn. Super. L. & Eq. 1807). Opining on the meaning of Virginia's speedy trial right, the General Court of Virginia noted that the "whole purpose" of the right was to "secure [the accused] against protracted imprisonment." *Adcock*, 49 Va. at 676. And the federal Supreme Court of the Territory of Montana recognized the right's core focus on pretrial incarceration:

> Among the principles that adorn the common law, making it the pride of all English-speaking people, and a lasting monument to the noble achievements of liberty over the encroachments of arbitrary power, are the following: No man can be rightfully imprisoned except upon a charge of crime properly made in pursuance of the law of the land. No man, when so imprisoned upon a lawful charge presented in a lawful manner specifying the crime, can be arbitrarily held without a trial.
>
> These principles are in accord with the enlightened spirit of the common law, and form a part of the framework of the English Constitution. They are guaranteed and secured by Magna Charta, the Petition of Rights, the Bill of Rights, and by a long course of judicial decision, and they belong to us as a part of our inheritance from the mother country. These rights were claimed by our ancestors in Colonial times, and they have been engrafted into and secured by our Constitution, the supreme law of the land[.]

*United States v. Fox*, 3 Mont. 512, 515–16 (1880) (holding that, at common law, a prosecutor's neglect or laches constitutes a denial of a speedy trial).

To be sure, after crossing the Atlantic, the scope of the right began to expand—guaranteeing a right to speedy resolution of criminal prosecutions even without pretrial detention. *See, e.g.*, *State v. Buyck*, 2 S.C.L. 563, 564 (S.C. Const. App. 1804) ("[I]t was the duty of the court to take care that criminal causes should not be unreasonably protracted or delayed" even for defendants discharged from confinement on bail.); *Adcock*, 49 Va. at 677 (noting that the Virginia's 1786 speedy trial statute included a "new and additional provision for a discharge from the crime upon failure to try at the third [term]"); *Fox*, 3 Mont. at 517 ("A person charged with crime, whether in prison or on bail, has the right to demand diligence on the part of the prosecution, to the end that he may speedily know whether he is to be convicted or acquitted."). But, from its origins, the core right protected the accused from long detention without an adjudication of guilt.

## C.

Supreme Court jurisprudence confirms the primacy of the concern against prolonged pretrial detention. Although lower state and federal courts contemplated the meaning of the right to a speedy trial for over a century, the issue did not reach the Court until 1905. *See Beavers v. Haubert*, 198 U.S. 77 (1905). In that case, the Court described the right as "necessarily relative," meaning it is "consistent with delays and depends upon circumstances." *Id*. at 87. While the speedy trial right "secures rights to a defendant," the Court held that it "does not preclude the rights of public justice." *Id*. By framing the right in this way, the Court suggested that the right permits consideration of societal or governmental

objectives.[25]  But importantly, the defendant in *Beavers* was not incarcerated throughout his charges, so perhaps the Court was more willing to engage in interest balancing given that the defendant was not totally deprived of his liberty for most of his criminal proceedings.

Today, the Court recognizes that the Sixth Amendment's primary guarantee is against "undue and oppressive incarceration prior to trial." *United States v. Ewell*, 383 U.S. 116, 120 (1966) (listing the concern for pretrial incarceration above the speedy trial right's other interests "to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself").  As the Court explained, "the Speedy Trial Clause's core concern is impairment of liberty[.]" *United States v. Loud Hawk*, 474 U.S. 302, 312 (1986).  Moreover, the Court has said, "[t]he speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial," in addition to protecting the interest of those on bail and "to shorten[ing] the disruption of life caused by arrest and the presence of unresolved criminal charges." *United States v. MacDonald*, 456 U.S. 1, 8 (1982).  As Justice Thomas has said, "[t]he touchstone of the speedy trial right, after all, is the substantial deprivation of liberty that typically accompanies an 'accusation[.]'" *Doggett v. United States*, 505 U.S. 647, 663 (1992) (Thomas, J., dissenting).

In 1972, the Court introduced the balancing approach still in use today.  *See Barker v. Wingo*, 407 U.S. 514 (1972).  In denying the defendant's speedy trial claim, the Court rejected a bright-line rule, counseling that courts must instead consider such challenges on an "ad hoc basis."  *Id.* at

---

[25] *See* Garcia, *supra* note 1, at 159.

530. As a result, the Court listed factors that should be considered: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.*

Based on this history and precedent, I see no constitutional violation here. As I've said before, we should always read precedent "in light of and in the direction of the constitutional text and constitutional history." *Edmo v. Corizon, Inc.*, 949 F.3d 489, 506 (9th Cir. 2020) (Bumatay, J., dissenting from the denial of rehearing en banc) (simplified). Given that the speedy trial right's core historic concern against *prolonged pretrial detention* is not at stake here, I see no reason to depart from modern precedent permitting some reasonable trial delay. And as I read our precedent, Olsen's two-month trial delay is not nearly long enough to justify dismissal under the Constitution. *See Barker*, 407 U.S. at 534 (declining to find a speedy trial right violation even after a defendant on bail waited four years for trial). Yet, as stated earlier, this case would be very different if Olsen had been detained during the COVID-19 pandemic and had suffered the deprivation of his liberty while the California federal district court shut down indefinitely.[26]

## II.

Resolving the constitutional question is only part of this case. The district court also dismissed Olsen's indictment based on the Speedy Trial Act. *See* 18 U.S.C. § 3161. Generally, the Act permits district courts to continue a

---

[26] Judge Collins misconstrues my constitutional analysis. Contrary to his suggestion, I do not say that the Speedy Trial Clause applies *only* to those in custody. Collins Dissent 92 n.20. Rather, I simply attempt to trace the right's original public meaning and show how that meaning should guide our interpretation today.

defendant's trial with a finding that the "ends of justice" outweigh "the best interest of the public and the defendant in a speedy trial." *Id.* § 3161(h)(7)(A). In reaching an ends-of-justice continuance, the court may consider "[w]hether the failure to grant such a continuance . . . would . . . likely . . . make a continuation of such proceeding impossible, or result in a miscarriage of justice." *Id.* § 3161(h)(7)(B)(i). The panel reversed the district court's dismissal because both the "impossib[ility]" and "miscarriage of justice" exceptions justified a continuance here. *Olsen*, 995 F.3d at 691–92.

On the "impossib[ility]" exception, I agree with Judge Collins's persuasive dissent. *See* Collins Dissent, Section III. As the district court found, it was "[c]learly . . . possible" to hold jury trials as both federal grand juries and state jury trials had resumed in the area. *Olsen*, 995 F.3d at 689. Like Judge Collins, I would conclude no impossibility excused the delay in Olsen's trial.[27]

But, in the end, I concur in the denial of rehearing because the panel correctly determined that the district court should have considered whether the "miscarriage of justice" exception would have supported a continuance of Olsen's trial. Under an evaluation of that exception, courts may consider the government's interest in seeking a continuance. And given the lack of government culpability and the relatively short two-month continuance at issue, an ends-of-justice continuance would have been appropriate here.

---

[27] Perhaps Judge Collins is correct that we should have called this case en banc to fix the erroneous interpretation of the "impossib[ility]" exception. Ultimately, I opted against that route because I conclude that the "miscarriage of justice" exception justifies the delay here.

The Speedy Trial Act doesn't define "miscarriage of justice."  And there is a dearth of caselaw discussing what constitutes a "miscarriage of justice."  But that is not fatal—it is illuminating.  The lack of bright lines shows that the phrase is context specific.  While its precise meaning may be amorphous, "miscarriage of justice" is generally defined as "[a] grossly unfair outcome in a judicial proceeding[.]" Black's Law Dictionary (11th ed. 2019).[28]  In codifying this phrase, Congress gave courts some latitude in applying the ends-of-justice continuation, ensuring that justice is served even if a continuance does not fit the precise contours of the other three enumerated factors.  *See* 18 U.S.C. § 3161(h)(7)(B)(ii)–(iv).  Thus, the miscarriage of justice exception is broad enough to encompass both the interests of the defendant and the government in determining whether a lack of a continuance would lead to a "grossly unfair outcome."

The Act's structure reinforces this view.  Other enumerated factors show that the government's interest is to be considered in an ends-of-justice continuance.  *See id.* (balancing the "nature of the prosecution," the Government's ability to secure "continuity of counsel," and the "reasonable time" necessary for the Government's "effective preparation" for trial).  So the factors listed in § 3161(h)(7)(B) already presuppose weighing the interests of both the government and the defendant in considering a continuance.

And contrary to Judge Collins's dissent, the "miscarriage of justice" exception may consider whether the lack of a

---

[28] *See also Miscarriage of Justice*, Black's Law Dictionary (5th ed. 1979) ("Decision or outcome of legal proceeding that is prejudicial or inconsistent with substantial rights of party").

continuance would result in unjust *outcomes*.   Judge Collins would limit the "miscarriage of justice" exception to address only "whether more time is needed . . . to ensure . . . the fairness of the trial proceedings *themselves*."   Collins Dissent 90 (emphasis original) (citing cases using the "miscarriage of justice" exception to ensure fair trial proceedings, such as granting the government more time to effectively prepare for trial).   But there's no textual reason to allow the exception to evaluate only *trial proceedings*, rather than also *trial outcomes*.   Indeed, other enumerated factors already concern the fairness of trial proceedings, specifically allowing "the Government the reasonable time necessary for effective preparation."   *See* 18 U.S.C. § 3161(h)(7)(B)(ii), (iv).   The "miscarriage of justice" exception, then, must mean something different from simply ensuring fair trial proceedings.   Tellingly, "miscarriage of justice" is paired with "impossib[ility]."   *Id*. § 3161(h)(7)(B)(i).   To me, rendering a proceeding "impossible" is an "outcome."   So it makes sense that the "miscarriage of justice" and "impossibility" exceptions would both have an "outcome" component.   In short, courts don't need to blind themselves to alternative *outcomes* in considering the "miscarriage of justice" exception.

Given this understanding, I don't think the panel was wrong to consider the "absence of any government culpability or [the] minimal prejudice to Olsen" in a two-month continuance of trial to reverse the Speedy Trial Act violation. *Olsen*, 995 F.3d at 692.   Of course, "Congress did not intend the 'ends of justice' exclusion to be granted as a matter of course but rather to be used sparingly and only when necessary." *United States v. Lewis*, 980 F.2d 555, 560 (9th Cir. 1992).   So we should be careful not to use this case as a launchpad to expand ends-of-justice continuances.

## III.

COVID-19 does not put the Constitution on hold.  Courts must always be vigilant in protecting constitutional rights. Yet, because Olsen was not under pretrial detention, I do not believe he suffered a deprivation of his Sixth Amendment speedy trial right.  Nor does the Speedy Trial Act compel dismissal of the charges under proper consideration of the "miscarriage of justice" exception.  Thus, I concur in the denial of rehearing en banc.

---

COLLINS, Circuit Judge, with whom FORREST, Circuit Judge, joins, dissenting from the denial of rehearing en banc:

Even in the midst of a pandemic, there are some things that, in a constitutional republic, should be all but unthinkable.  *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (noting that, "even in a pandemic, the Constitution cannot be put away and forgotten").  There are measures that, given the scope and duration of their infringement on fundamental rights, may be maintained, if at all, only upon the weightiest of showings. *See id*. (stating that, "[b]efore allowing" pandemic-related measures that "strike at the very heart" of a constitutional guarantee, the courts "have a duty to conduct a serious examination of the need for such a drastic measure").  That category includes ordering the closure of all houses of worship,[1] prohibiting nearly all in-person instruction at

---

[1] *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021) (statement of Gorsuch, J., joined by Thomas and Alito, JJ.) (noting that California had failed "to explain why it cannot address its legitimate concerns with rules short of a total ban"); *id*. at 717

private schools,[2] broadly forbidding people from gathering inside homes for constitutionally protected activities such as Bible studies,[3] and requiring everyone to stay in their homes except to the extent that the government grants them permission to leave.[4]  This case presents another such example—the wholesale suspension of criminal jury trials.

Even though the California state courts managed to conduct numerous criminal jury trials during the same time period, the Central District of California issued General Orders that, based on Covid-related concerns, prohibited any federal criminal jury trials for nearly 14 months.  In its decision in this case, the panel rejected criminal defendant Jeffrey Olsen's contention that the Central District's suspension of jury trials violated his rights under the Speedy Trial Act, which implements the Sixth Amendment's guarantee of a "speedy and public trial."  We have previously stated that we are "quick to pay homage to the Sixth Amendment to the Constitution of the United States and its implementation, The Speedy Trial Act," because "[e]xcept for the right of a fair trial before an impartial jury

---

(Barrett, J., joined by Kavanaugh, J., concurring in part) (agreeing with Justice Gorsuch's statement on this point).

[2] *Brach v. Newsom*, 6 F.4th 904, 927–33 (9th Cir. 2021), *vacated on grant of rehearing en banc*, 18 F.4th 1031 (9th Cir. 2021).

[3] *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021).

[4] *South Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 944 n.5 (9th Cir. 2020) (Collins, J., dissenting) ("Even the most ardent proponent of a broad reading of *Jacobson* [*v. Massachusetts*, 197 U.S. 11 (1905),] must pause at the astonishing breadth of [the stay-at-home order's] assertion of government power over the citizenry, which in terms of its scope, intrusiveness, and duration is without parallel in our constitutional tradition.").

no mandate of our jurisprudence is more important." *See Furlow v. United States*, 644 F.2d 764, 768–69 (9th Cir. 1981). To be sure, the panel here paid lip service to "the importance of the right to a speedy and public trial," which it acknowledged is "among the most important protections guaranteed by our Constitution" and "is not one that may be cast aside in times of uncertainty." *United States v. Olsen*, 995 F.3d 683, 695 (9th Cir. 2021). But then, without ever considering whether there was any way in which criminal jury trials could have been conducted during the pandemic— as the state courts managed to do—the panel proceeded to uphold the Central District's lengthy suspension of jury trials by invoking overall public health concerns: "[S]urely a global pandemic that has claimed more than half a million lives in this country, and nearly 60,000 in California alone, falls within such unique circumstances to permit a court to temporarily suspend jury trials in the interest of public health." *Id.* at 693.

"Stemming the spread of COVID-19 is unquestionably a compelling interest." *Diocese of Brooklyn*, 141 S. Ct. at 67. But even weighty claims of danger to public health must be measured against the demands of the law, and here the relevant provisions of the Speedy Trial Act are fairly stringent. Applying those standards, the district court held that, almost six months into the pandemic, the Government had failed to show that a further continuance of Olsen's trial was justified. *United States v. Olsen*, 494 F. Supp. 3d 722 (C.D. Cal. 2020). Indeed, the court expressed incredulity that the suspension of jury trials had gone on for so long, despite the wide range of other activities occurring in the same community:

> Quite frankly, the Court is at a loss to understand how the Central District

continues to refuse to resume jury trials in the Orange County federal courthouse. The Internal Revenue Service, the Social Security Administration, and other federal agencies in Orange County are open and their employees are showing up for work. Police, firefighters, and other first responders in Orange County are all showing up for work. Hospitals and medical offices in Orange County are open to patients and the medical professionals are showing up for work. Grocery stores, hardware stores, and all essential businesses in Orange County are open and their employees are showing up for work. State courts in Orange County are open and holding jury trials. Orange County restaurants are open for outdoor dining and reduced-capacity indoor dining. Nail salons, hair salons, body waxing studios, massage therapy studios, tattoo parlors, and pet groomers in Orange County are open, even indoors, with protective modifications. Children in Orange County are returning to indoor classes at schools, with modifications. Even movie theaters, aquariums, yoga studios, and gyms in Orange County are open indoors with reduced capacity. Yet the federal courthouse in Orange County somehow remains closed for jury trials. The Central District's refusal to resume jury trials in Orange County is indefensible.

*Id*. at 731. Because the district court refused to grant a further continuance of Olsen's trial, that trial did not occur within the time frame specified by the Speedy Trial Act, and

the district court dismissed the indictment with prejudice. *Id*. at 734.

Confident that the pandemic "surely" justified the Central District's extended "suspen[sion] [of] jury trials in the interest of public health," the panel reversed the district court and held that Olsen's trial should have been continued, based on Covid-related concerns, under the Speedy Trial Act's "ends of justice" exception." 995 F.3d at 695. But in its determination to uphold this unprecedented and disturbing suspension of a crucial constitutionally-based right, the panel's decision egregiously misinterpreted the Act's ends-of-justice exception in a way that does serious damage to this critically important statute. These errors, which fundamentally alter and misunderstand how the statute works, have troubling implications that will extend well beyond the pandemic. Under any proper understanding of the Speedy Trial Act, the district court here correctly concluded that the Government had failed to show that a further continuance of Olsen's trial was consistent with the Act's standards. And because Olsen's trial did not take place within the time specified in the Act, the dismissal of Olsen's indictment was mandatory, although the district court had discretion to decide whether that dismissal should be with or without prejudice. *See* 18 U.S.C. § 3162(a)(2). I agree with the panel's alternative ruling that the district court abused that discretion in dismissing Olsen's indictment *with* prejudice. *See* 995 F.3d at 694–95. But the panel's decision did considerable damage to the Speedy Trial Act when it held that Olsen's trial should have been continued, that there was no violation of the Act, and that Olsen's indictment should not be dismissed without prejudice.

We should not have let the Speedy Trial Act be counted among Covid's latest casualties. I respectfully dissent from our refusal to rehear this case en banc.

# I

## A

On July 6, 2017, Jeffrey Olsen was indicted on one count of making a false statement on an application to obtain a federal controlled substance registration, *see* 21 U.S.C. § 843(a)(4)(A), and 34 counts of unlawfully prescribing and distributing, as a licensed physician, various controlled substances, *see id*., § 841(a)(1). At his arraignment on July 11, 2017, Olsen pleaded not guilty, posted bond, and was released from custody. His trial was initially set for September 5, 2017, which is within the 70-day window prescribed by the Speedy Trial Act. *See* 18 U.S.C. § 3161(c)(1) ("In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.").

The Speedy Trial Act recognizes that there may be grounds to delay the trial beyond the default 70-day window, and it therefore sets forth eight specific grounds for excluding certain periods of time from the calculation of the 70-day period. 18 U.S.C. § 3161(h)(1)–(8); *United States v. Daychild*, 357 F.3d 1082, 1090 (9th Cir. 2004). Among these grounds are the "unavailability of the defendant or an essential witness," *see* 18 U.S.C. § 3161(h)(3)(A); "other proceedings concerning the defendant," including pretrial

motions or interlocutory appeals, *id*. § 3161(h)(1); mental or physical incapacity of the defendant, *id*. § 3161(h)(4); or delays associated with a codefendant with whom the defendant is joined for trial, *id*. § 3161(h)(6).  One of the eight exceptions is a residual "ends of justice" exception that authorizes the exclusion of time from the 70-day clock when a continuance is granted by a judge "on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."  18 U.S.C. § 3161(h)(7)(A).  Invoking that exception, Olsen sought (with the Government's concurrence) the following five continuances of his trial, all of which were granted:

- Olsen requested the exclusion of the 148 days from September 5, 2017 until January 30, 2018 on the ground that, in light of the voluminous discovery produced by the Government ("31,181 pages of documents and files"), his counsel's schedule, and the need to prepare for trial "in the event that a pretrial resolution does not occur," a "failure to grant the continuance will deny him continuity of counsel and adequate representation."

- Noting that the Government's discovery had ballooned to "approximately 197,343 pages of documents and files," including "text messages, pictures, and audio and video recordings," Olsen relied on similar grounds in requesting the exclusion of the 196 days from January 30, 2018 through August 14, 2018.[5]

---

[5] Although the court's order states that the time period is "inclusive" of the starting and ending dates, the same was true of the prior order, and

- Olsen requested the exclusion of the 102 days from August 14, 2018 through December 4, 2018 on the grounds that defense counsel needed additional time to review the discovery and prepare for trial, which included "finding an expert."

- For essentially the same grounds as stated in the prior request, Olsen requested the exclusion of the 196 days from December 4, 2018 until June 18, 2019.

- After Olsen's retained counsel moved to withdraw in February 2019 based on "serious differences of case strategy that cannot be reconciled," the court relieved counsel and appointed the Federal Public Defender as counsel for Olsen. Based on this change of counsel, Olsen requested the exclusion of the 140 days from June 18, 2019 through November 5, 2019.

In August 2019, Olsen sought a sixth continuance, but the Government opposed this request. Olsen's counsel explained that, upon review of the Government's "41 GB" of discovery, including "roughly 77,000 files," she discovered that "the majority of files were either not copied or corrupted." She requested and received replacement files, and she assigned a paralegal to assist in "uploading and cataloguing all files to the CaseMap software." Because the nearly 16,000 pages of handwritten prescriptions were "not easily converted to a searchable format," she explained that these required individual review and processing. She also stated that she needed more time to review the Government's expert disclosures and to identify and retain experts of her own. She further noted that the Government itself spent

---

a day covered by both orders (*e.g.*, January 30, 2018) can only be excluded once.

more than six years investigating Olsen before he was indicted, and she argued that her requests for additional time were warranted in the context of this "document-heavy case." The court held a hearing on this request, during which it expressed disappointment in itself for having "allowed this case to be continued so much." In response, the prosecutor explained that:

> "[P]art of the reason why there has been a number of continuances was because I was having a fairly forthright conversation—or communications with the prior defense counsel. And her belief and my belief was that Mr. Olsen would—will ultimately plead guilty. And that entailed in part [a] reverse proffer that the government conducted with Mr. Olsen.

After hearing from both sides, the court granted the requested continuance and, invoking the ends-of-justice exception, it excluded from the Speedy Trial Act's 70-day clock the 182 days from November 5, 2019 through May 5, 2020.

Based on the ends-of-justice exception, Olsen successfully requested two further continuances, with the Government's concurrence, as follows:

- Due to scheduling conflicts of defense counsel, and the disruption to court operations resulting from the pandemic, Olsen requested exclusion of the 77 days from May 5, 2020 through July 21, 2020.

- Based on essentially the same grounds, Olsen requested exclusion of the 84 days from July 21, 2020 through October 13, 2020.

**B**

In August 2020, the court called a status conference after it learned that Olsen would not agree to any further continuances of the trial date.[6]   At that conference, the Government stated that it would file an opposed application for a continuance.   In its ensuing application, the Government moved to continue the trial from October 13, 2020 to December 1, 2020 and to exclude the additional 49 days under the ends-of-justice exception.  The gravamen of the application was that "conducting a jury trial during a pandemic without district-wide protocols for conducting jury trials may jeopardize the health of prospective jurors, witnesses, defendant, trial counsel, and court personnel." Olsen opposed the application, arguing that "the courts have had several months to address" the pandemic and that a further blanket and "functionally open-ended" suspension of trials could not be justified.

On September 2, 2020, the district court denied the Government's application, concluding that, in light of the many criminal jury trials being conducted in the nearby Orange County Superior Court and the successful conducting of grand jury proceedings in the federal courthouse, the Government had not shown that it was impossible to conduct a trial.    *See*  18 U.S.C. § 3161(h)(7)(B)(i) (stating that one factor to consider, under the ends-of-justice exception, is whether "the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible"). Accordingly, the court requested that the Chief Judge "direct

---

[6] The panel is therefore simply wrong in insinuating that the objection to the extension originated with the district court rather than with Olsen. *See* Panel Concurrence at 30–31.

the Jury Department to summon jurors," but the Chief Judge denied that request the very next day in a written order that relied only on the then-applicable General Order that "suspended jury trials until further notice."

On September 15, 2020, Olsen preemptively moved for dismissal of his indictment on the basis that his Speedy Trial Act and Sixth Amendment rights were violated by the imminent failure to bring him to trial within the Speedy Trial Act's timeframe, which would expire on October 27, 2020. Because dismissal of the indictment, either with or without prejudice, is the mandatory remedy under the Speedy Trial Act for a failure to timely bring the defendant to trial, *see* 18 U.S.C. § 3162(a)(2), the Government's opposition argued only that (1) the motion was premature until the time actually ran out on October 27, and (2) any dismissal should be without prejudice. The district court granted the motion to dismiss the indictment, with prejudice, effective on the first day after the Speedy Trial Act expired, *i.e.*, October 28, 2020. *Olsen*, 494 F.Supp.3d at 733–34.

## C

The Government appealed the dismissal, and the panel reversed and remanded, directing that Olsen's indictment be reinstated, that an appropriate continuance be granted, and that the case be set for trial. *Olsen*, 995 F.3d at 695. The panel relied on three grounds for concluding that the Government's requested continuance under the ends-of-justice exception should have been granted.

First, the panel held that the district court had erroneously proceeded on the assumption that "literal impossibility is the relevant standard for an ends of justice continuance." 995 F.3d at 690. The panel concluded that, under a proper understanding of the Act's reference to

whether a proceeding would be "impossible" absent a continuance, the Government's requested continuance was warranted.  According to the panel, that was true because, in light of the General Order's complete prohibition of jury trials, a failure to grant the continuance "*did* make 'a continuation of [Olsen's] proceeding impossible.'"  *Id*. at 691 (quoting 18 U.S.C § 3161(h)(7)(B)(i)).  Second, the panel held that, because the failure to grant the requested continuance would lead to dismissal of the indictment, the result would be a "miscarriage of justice."  *Id*. at 691–92.  Third, the panel concluded that the district court had erred by failing to consider a set of non-statutory factors that, in light of the pandemic, the panel thought that it should have addressed.  *Id*. at 692.[7]

## II

The Speedy Trial Act's ends-of-justice exception provides that the "period of delay resulting from a continuance" is excluded from the Act's 70-day clock "if the judge granted such continuance on the basis of his finding that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."  18 U.S.C. § 3161(h)(7)(A).  "Realizing that broad discretion would undermine the mandatory time limits of the Act, Congress intended that this provision be 'rarely used' and enumerated four factors to be considered by the judge in granting an ends of justice continuance."  *United States v.*

---

[7] The panel also alternatively held that, even if the continuance was properly denied, the district court abused its discretion by dismissing the indictment *with* prejudice rather than without prejudice.  995 F.3d at 693–95.  I agree with this alternative holding; the indictment should have been dismissed without prejudice rather than with prejudice.  *See infra* at 92–94.

*Nance*, 666 F.2d 353, 355 (9th Cir. 1982) (citation omitted).[8] These factors, however, are not exclusive.  *See* 18 U.S.C.

---

[8] Specifically, the statute provides:

> The factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A) of this paragraph in any case are as follows:
>
> (i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.
>
> (ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.
>
> (iii) Whether, in a case in which arrest precedes indictment, delay in the filing of the indictment is caused because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or because the facts upon which the grand jury must base its determination are unusual or complex.
>
> (iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable

§ 3161(h)(7)(B) (stating that, in applying the ends-of-justice exception, the court should consider the four statutory factors, "among others").  In challenging the denial of its requested continuance, the Government relied on only the first of the four statutorily enumerated factors, namely:

> Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.

18 U.S.C. § 3161(h)(7)(B)(i).[9]

The panel seriously misconstrued both prongs of this statutory factor, namely, (1) what it means to say that "the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible"; and (2) what counts as "a miscarriage of justice" so as to justify a continuance.  18 U.S.C. § 3161(h)(7)(B)(i).  The panel also improperly diluted both prongs through its use of novel non-statutory considerations. I will discuss each of these prongs separately.

---

> time necessary for effective preparation, taking into account the exercise of due diligence.

18 U.S.C. § 3161(h)(7)(B).

[9] Although several of the other factors—such as those focused on adequate preparation time and continuity of counsel—were implicated in some of the *earlier* continuances that were granted in Olsen's case, they provided no support for the Government's final requested continuance.  By that point, all parties had had ample time to prepare.

# III

In concluding that the district court's denial of a continuance would make proceeding with a trial "impossible" within the meaning of § 3161(h)(7)(B)(i), the panel erred in three critical respects.

# A

In finding that the impossibility standard was met here, the panel reasoned that, "[b]ecause not granting the government's continuance meant that the Speedy Trial Act clock would necessarily expire before Olsen could be brought to trial, it follows that the district court's 'failure to grant' an ends of justice continuance in this case *did* make 'a continuation of [Olsen's] proceeding impossible.'" 995 F.3d at 691. Of course, the only reason why the Speedy Trial Act clock would expire after a denial of the continuance is that the Central District's then-applicable General Order forbade any jury trials from taking place during the remainder of the time left on that clock. The panel's opinion thus treated the General Order *itself* as an externality that rendered a trial "impossible," thereby satisfying the statutory standard. *See* 995 F.3d at 691; *see also id*. at 695 ("The orders acknowledge the importance of the right to a speedy and public trial both to criminal defendants and the broader public, and conclude that, considering the continued public health and safety issues posed by COVID-19, proceeding with such trials would risk the health and safety of those involved, including prospective jurors, defendants,

attorneys, and court personnel."). The panel's analysis is deeply flawed.[10]

By allowing the Central District's General Order to serve as the source of the impossibility that justifies a continuance, the panel's analysis rests on a bootstrap argument that permits a wholesale evasion of the impossibility standard.[11] It should go without saying that, in applying the Speedy Trial Act, the analysis must turn on whether the *Act's* standard for impossibility is met, regardless of what any General Order says. If the asserted source of the impossibility is a General Order of the court itself, then *that* order must be subject to, and comply with, the strictures of the Act. *See* FED. R. CRIM. P. 57(a)(1), (b) (local rules and orders must be "consistent

---

[10] The panel's concurrence chastises me for failing to mention "the fact that the Circuit's Judicial Council reviewed the Central District's General Order, thereafter approving its declaration of a judicial emergency." Panel Concurrence at 30. The cited Judicial Council order only approves the declaration of a "judicial emergency" under the separate provisions of 18 U.S.C. § 3174, which has no applicability here. *See In re Approval of Jud. Emergency Declared in the Cent. Dist. of Cal.*, 955 F.3d 1140 (9th Cir. Jud. Council 2020); *see also infra* at 91 n.19. That order did not review or approve the Central District's open-ended suspension of criminal jury trials. Indeed, the Judicial Council has no role in making case-specific Speedy Trial Act determinations under § 3161(h).

[11] In its concurrence in the denial of rehearing en banc, the panel expressly denies that it has relied on any such bootstrap argument but then—without apparent awareness of the self-contradiction—the panel's explanation proceeds to make the exact same bootstrap argument. *See* Panel Concurrence at 35–36. Thus, in explaining why "not granting the government's [requested] continuance rendered trial impossible," the panel again reaffirms that the impossibility was "due to General Order 20-09's suspension of criminal jury trials." *Id.*; *see also id*. at 37 n.3 (explaining that the Government had shown that "*the General Orders . . . prevented jury trials*") (emphasis added).

with . . . federal statutes" and "federal law"). But the panel opinion never even considered whether the General Order made findings sufficient to establish that a trial was "impossible" within the meaning of the Act, nor did it address whether the General Order otherwise complied with the Act's specific standards.

Contrary to what the panel's concurrence in the denial of rehearing en banc now belatedly contends, *see* Panel Concurrence at 33–35, it is quite clear that the applicable General Order here did *not* rest on a proper application of Speedy Trial Act standards. The panel's contrary assumption is at war with the language of the Speedy Trial Act and with settled precedent construing it. Here is the relevant General Order's analysis that, under the panel opinion, *see* 995 F.3d at 695, substitutes for an adequate application of Speedy Trial Act standards:

> The Center for Disease Control and Prevention has warned that "in the coming months, most of the U.S. population will be exposed to this virus." The COVID-19 rates of infection, hospitalizations and deaths have significantly increased in the Central District of California in the last thirty days such that holding jury trials substantially increases the chances of transmitting the Coronavirus. The Court concludes that conducting jury trials would also likely place prospective jurors, defendant, attorneys, and court personnel at unnecessary risk. Therefore, the Court finds that suspending criminal jury trials in the Central District of California because of the increase in reported COVID-19 infections, hospitalizations, and deaths *serves the ends of*

> *justice and outweigh the interests of the*
> *public and the defendants in a speedy trial.*

Gen. Order No. 20-09 ¶ 6 (C.D. Cal. Aug. 6, 2020) (emphasis added).[12]  The mere recital of the Speedy Trial Act's ultimate standard does not establish that the General Order reflects a proper application of the Act's standards.  In particular, three essential aspects of any application of the Act's ends-of-justice exception are missing.

First, the "suspending" of jury trials in the General Order was entirely open-ended, even though, under long-settled Ninth Circuit precedent, the Act requires than any "'ends of justice' continuance *be specifically limited in time* and that there be findings supported by the record to justify each 'ends of justice' continuance."  *United States v. Jordan*, 915 F.2d 563, 565 (9th Cir. 1990) (emphasis added).[13]

---

[12] The panel faults me for not quoting the General Order's "Whereas" clauses, which refer in general terms to the growing number of Covid cases and deaths and to the guidance issued by the Centers for Disease Control and Prevention.  *See* Panel Concurrence at 34.  But these clauses do not meaningfully add to the above-quoted analysis, nor do they address the various respects in which the General Order does not match up with settled Speedy Trial Act standards.

[13] This Order differs from the initial General Order issued at the onset of the pandemic in March 2020, which specified a fixed 30-day exclusion, subject to the order of the individual judge in the case.  *See* Amended Gen. Order 20-02 ¶ 4 (C.D. Cal. Mar. 17, 2020)*.*  Such an across-the-board 30-day exclusion is arguably authorized by the very limited temporary emergency authority set forth in 18 U.S.C. § 3174(e), but any further such exclusion would have to be individually implemented in each case.  *See infra* at 79.  In any event, in Olsen's case, that particular 30-day time period had already been excluded for other reasons, and further exclusions of time, early in the pandemic, were made in his case (without objection) in part on Covid-related grounds. *See supra* at 69.

Second, because the General Order is just that—a general order—it does not, and cannot, substitute for the case-specific findings that are required to be made under § 3161 of the the Act. *Zedner v. United States*, 547 U.S. 489, 509 (2006) (noting that § 3161(h)(7) "demands on-the-record findings and specifies in some detail certain factors that a judge must consider in making those findings").[14] Specifically, after reciting the standard for an ends-of-justice continuance, the Act expressly states that "[n]o such period of delay" under the ends-of-justice exception "shall be excludable under this subsection *unless* the court sets forth, *in the record of the case*, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A) (emphasis added). As flawed as the panel's opinion is, the panel concurrence would make things even worse by explicitly endorsing the remarkable proposition that the judges of a district court, by general order, may issue blanket, district-wide exclusions of time under the ends-of-justice exception of the Speedy Trial Act. *See* Panel Concurrence at 33–35, 40–41. That view directly contravenes the Speedy Trial Act's requirement of individualized case-specific consideration, and it also effectively nullifies the carefully drawn limits of the Act's separate provision for district-wide relief in emergency situations. *See* 18 U.S.C. § 3174(b) (stating that, upon declaration of a qualifying judicial emergency within a district, the 70-day clock may be increased to 180 days for subsequently filed indictments).

---

[14] At the time that *Zedner* was decided, the ends-of-justice exception was contained in § 3161(h)(8). In 2008, Congress struck subsection (h)(5) and renumbered the remaining subsections. *See* Pub. L. No. 110-406 § 13(2)–(3), 122 Stat. 4291, 4294 (2008).

Third, there is no indication in the General Order that its conclusion rested on a consideration of the relevant statutory factors that "a judge *shall* consider in determining whether to grant a continuance" under the ends-of-justice exception. 18 U.S.C. § 3161(h)(7)(B) (emphasis added); *see also Zedner*, 547 U.S. at 509. In particular, the General Order was entered without properly considering or applying the impossibility standard of § 3161(h)(7)(B)(i). The order merely states that proceeding with criminal jury trials would "likely place prospective jurors, defendant, attorneys, and court personnel at unnecessary *risk*." *See* Gen. Order 20-09 ¶ 6 (emphasis added). But that unadorned statement says nothing about whether the court had considered whether there were any available measures that might mitigate those risks, such that proceeding with a trial would not be "impossible." 18 U.S.C. § 3161(h)(7)(B)(i). Instead, the order simply declared criminal jury trials—a core constitutional right—to be, for an indefinite period, "unnecessary" and dispensable.

For all of these reasons, the panel opinion was quite wrong in effectively allowing the General Order to serve, without more, as a sufficient justification for finding that "the failure to grant . . . a continuance" in Olsen's trial "would be likely to make a continuation of such proceeding impossible." 18 U.S.C. § 3161(h)(7)(B)(i). The General Order did not itself meet the Act's standards, and it therefore cannot excuse non-compliance with those standards in an individual case.

**B**

Because the panel improperly relied on the General Order to establish that trials were "impossible," the panel failed to articulate or apply any standard of its own for determining whether a trial was "impossible" within the

meaning of this statutory factor.  Thus, beyond rejecting the strawman argument that "*literal* impossibility" serves as the "relevant standard," 995 F.3d at 690 (emphasis added),[15] the panel failed to articulate *any* standard for assessing how much practical difficulty would satisfy the Act's "impossible" factor.  This, too, was error, because under any reasonable construction of that factor, the district court correctly concluded that it was not met here.

In ordinary usage, the term "impossible" has a range of meanings that extend from "incapable of being or of occurring" (which is closer to the literal impossibility standard that the panel rejects) to "extremely and almost insuperably difficult under the circumstances." *Impossible*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 1136 (1981).  The latter definition,

---

[15] Contrary to what the panel suggests, the district court did not ignore logistical or practical constraints.  In its analysis of the impossibility factor, the district court specifically focused on whether conducting a trial would be a "physical and logistical impossibility" or an "actual" impossibility.  *See Olsen*, 494 F. Supp. 3d at 722, 727–28 & n.4.  The panel concurrence's similar suggestion that the district court ignored "logistical problems," *see id.* at 37, is flatly belied by the district court's opinion.  *See*, *e.g.*, *Olsen*, 494 F.Supp.3d at 729 (noting the protective measures adopted by the Orange County Superior Court, including "staggering times for juror reporting, trial start, breaks, and concluding for the day, seating jurors during trial in both the jury box and the audience area, marking audience seats, and using dark courtrooms as deliberation rooms," as well as "regularly disinfect[ing] the jury assembly room and restrooms, provid[ing] facial coverings, us[ing] plexiglass shields in courtrooms, and requir[ing] trial participants to use gloves to handle exhibits").  And the panel concurrence's insinuations against the district court's impartiality, *see*, *e.g.*, *id.* at 31 (questioning court's "misguided motive"); *id.* at 37  n.3 (asserting that it is "clear that the district court had made up its mind" and would not consider any showing by the Government), are refuted by that court's lengthy and considered published opinion.

of course, avoids the panel's strawman argument while respecting Congress's clear choice of a term that is much more demanding than potential alternatives such as "impracticable," "inconvenient," or, indeed, "unsafe." Moreover, as the panel concedes in its concurrence, *see* Panel Concurrence at 42–43, this understanding of "impossible" is consistent with the two cases cited by the panel opinion that apply this factor. *See Furlow*, 644 F.2d at 767–69 ("relatively brief" two-week delay associated with eruption of Mt. St. Helens in 1980 justified ends-of-justice continuance in light of the "paralyzing impact" in the vicinity of the courthouse, "affecting the abilities of jurors, witnesses, counsel, [and] officials to attend the trial"); *United States v. Paschall*, 988 F.2d 972, 975 (9th Cir. 1993) (eight-day delay due to an inability to form a grand jury quorum because of a major snowstorm fell within the ends-of-justice exception). Here, the district court did not abuse its discretion in concluding that, although the sort of extreme and almost insuperable difficulty described in those cases may have been present at the initial outset of the pandemic in spring 2020, there was an insufficient basis to conclude that the same was true in October 2020.

As the district court noted, "grand juries have been convening for months in the same federal courthouse in Orange County where [Olsen's] trial would take place and state courts just across the street from that federal courthouse are conducting criminal jury trials." *Olsen*, 494 F. Supp. 3d at 724. The district court observed that grand juries must be comprised of at least sixteen people, and such juries had gathered in the very same courthouse to hear from witnesses, evaluate evidence, and deliberate with one another. *Id*. at 728–29. Meanwhile, the Orange County Superior Court had conducted "82 criminal jury trials and 4 civil jury trials" from June 2020 to September 2020. *Id*. at 729. Indeed, more

recent statistics confirm that state courts in the counties comprising the Central District ultimately conducted over 500 jury trials by March 2021. In light of these facts, it is clear that conducting federal criminal jury trials in Orange County was *not* "impossible," under any reasonable understanding of that term.

In its concurrence, the panel falls back on the generalized statement that "the unprecedented danger to health and safety presented by the pandemic, *particularly in its earlier days when Olsen sought to try his case*, cannot be overstated." *See* Panel Concurrence at 34 (emphasis added). This misstates the record. Olsen notably did *not* contend that continuances were unwarranted in the early days of the pandemic, when uncertainties were very high. On the contrary, he expressly stipulated to continuing his trial from May 2020 until October 2020 based in part on the disruption to court operations caused by the pandemic. *See supra* at 69. But by late summer, after the state courts had managed to resume conducting jury trials, Olsen objected that a further continuance was unjustified. At that point, it was no longer true that "the unprecedented danger to health and safety presented by the pandemic . . . *cannot be overstated*." *See* Panel Concurrence at 34 (emphasis added). The existence of "risks" to public safety, even significant ones, does not justify the cancellation of jury trials absent some sufficient basis for concluding that, as a practical matter, there are no feasible mitigation measures that would allow a trial to go forward.[16] That showing has not been made on this record; indeed, it was not even attempted. And the panel opinion

---

[16] Accordingly, the panel concurrence is flatly incorrect in asserting that "the dissent takes issue with considering the safety of the public, court staff, and counsel in an impossibility analysis." *See* Panel Concurrence at 43. Of course it is a consideration, but under the proper standards.

did not require such a showing, but instead held that, to justify a continuance, it was sufficient that the General Order simply cited the "risk" to "health and safety" that trials would present. *Olsen*, 995 F.3d at 695.

Moreover, the panel further watered down the Speedy Trial Act's demanding impossibility standard by relying on the panel's enumeration of seven *non-statutory* factors that it said the district court should have considered in deciding whether to grant a continuance. 995 F.3d at 692. There is no doubt that the four statutory factors for applying the ends-of-justice exception are not exhaustive, because they are introduced by the phrase "among others." 18 U.S.C. § 3161(h)(7)(B). But the fact that other factors may also be considered does not provide a license for rewriting the statutory factors in order to evade their limits. *See Bloate v. United States*, 559 U.S. 196, 208 (2010) (making this same point with respect to the non-exclusive list of "proceedings concerning the defendant" in § 3161(h)(1): "That the list of categories is illustrative rather than exhaustive in no way undermines our conclusion that a delay that falls within the category of delay addressed by subparagraph (D) is governed by the limits in that subparagraph."); *see also California ex rel. Sacramento Metro. Air Quality Mgmt. Dist. v. United States*, 215 F.3d 1005, 1013 (9th Cir. 2000) ("It is fundamental that a general statutory provision may not be used to nullify or to trump a specific provision."); *see also Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228-29 (1957) ("Specific terms prevail over the general in the same or another statute which otherwise might be controlling." (citation and internal quotation marks omitted)). But that is effectively what the panel did here.

The panel identified the following seven non-statutory factors that it said the district court should have considered

in deciding whether to grant the Government's-requested continuance "in the context of the pandemic":

> (1) whether a defendant is detained pending trial; (2) how long a defendant has been detained; (3) whether a defendant has invoked speedy trial rights since the case's inception; (4) whether a defendant, if detained, belongs to a population that is particularly susceptible to complications if infected with the virus; (5) the seriousness of the charges a defendant faces, and in particular whether the defendant is accused of violent crimes; (6) whether there is a reason to suspect recidivism if the charges against the defendant are dismissed; and (7) whether the district court has the ability to safely conduct a trial.

995 F.3d at 692–93. However, the panel conspicuously did not remand for the district court to apply these factors; instead, it remanded with explicit instructions to "grant" an appropriate continuance and set a new trial date. *Id*. at 695. The panel thus must be understood to have applied these factors itself. But the only one of them that even plausibly addresses "whether conducting trial would be physically possible" is the last factor, *i.e.*, "whether the district court has the ability to safely conduct a trial," and that is the only one of these factors that the panel opinion actually mentioned in the impossibility portion of its analysis. *Id*. at 693.[17] The panel concurrence likewise affirmatively

---

[17] The panel opinion adverted to several of the remaining non-statutory factors in its separate analysis of whether failing to grant a continuance would result in a "miscarriage of justice." *See Olsen*, 995

confirms that, in its view, this "safety" factor provides a "guiding principle[] for assessing the impossibility factor." *See* Panel Concurrence at 39; *see also id*. at 43 (expressly linking the panel's "seventh factor," concerning "safety," with the "impossibility analysis").    Indeed, the panel concurrence goes even further and suggests that non-statutory factors such as safety should be weighed against a finding, under the statutory factor, that "holding trial would be physically possible." *Id*. at 37–38.  And because the panel did not have enough confidence that trials could be conducted "safely," the panel concluded that a continuance was warranted. *Olsen*, 995 F.3d at 693.

The panel's analysis effectively replaced the statute's demanding statutory factor with a much more flexible non-statutory factor: instead of requiring a showing that conducting a trial would be "impossible"—*i.e.*, extremely and almost insuperably difficult under the circumstances, *see supra* at 81—the panel held that it is sufficient to show that there is "unnecessary risk" as to whether a trial can be conducted "safely."    The statute's use of the term "impossible" confirms Congress's judgment that deferring a criminal jury trial based on logistical considerations must be reserved for situations in which there are no feasible arrangements that would make a trial possible.  By creating a much more flexible "safety" exception to the Speedy Trial Act, the panel improperly invoked a non-statutory factor to evade the rigorous standard that Congress wrote in the overlapping *statutory* factor.  *See Bloate*, 559 U.S. at 208–09.    This rewrites the Speedy Trial Act and dilutes its protections.

---

F.3d at 692.  I address the panel's analysis of that issue below.  *See infra* at 89–94.

## C

In addition to watering down the Act's impossibility standard, the panel opinion committed a third clear error by shifting the burden of proof on the issue of impossibility (or safety) from the Government to Olsen.  The panel summarily dismissed the record evidence showing that the California state courts were conducting criminal jury trials, stating that, "just because state courts are holding jury trials does not mean that they are necessarily holding them safely."  995 F.3d at 693 n.10.  The *absence* of any evidence in the record on this safety issue, the panel held, was dispositive on this point: "Nothing in the record indicates that the Central District was able to hold a jury trial safely in October 2020, when Olsen's case was set for trial."  *Id*.  This is completely backwards.  Because the *Government* was the one moving for a continuance, it had the burden to establish that the continuance was justified under the Act.  *See, e.g.*, *United States v. Burrell*, 634 F.3d 284, 287 (5th Cir. 2011) ("[T]he Government bears the burden of establishing the applicability of this [ends of justice] exclusion as 'the trial court [did not] independently recognize[ ] the need for such a delay' and the Government is 'the party seeking to benefit from the delay.'" (citations omitted)).  But rather than hold that the Government—the moving party in seeking a continuance here—had thereby failed to carry its burden of proof to justify the continuance, the panel held that the lack of such evidence weighed *in favor* of a continuance.  *Id*.

The panel concurrence vigorously denies that the panel shifted the burden of proof but then, in the very next sentence, it confirms that the panel did just that.  The concurrence criticizes the district court, stating that, "*[w]ithout record support*, the district court announced that it was possible to move forward with trial."  *See* Panel

Concurrence at 37 n.3 (emphasis added).  But if there was no "record support" on this issue, then that necessarily means that the party who had the burden of proof failed to carry it.  Because the Government requested the extension, it had the burden of proof and failed to carry it.  By instead treating the absence of proof as a factor in *favor* of a continuance, the panel unquestionably flipped the burden of proof to Olsen.  That is a patent legal error.

The panel concurrence also relies on sheer speculation that, in adopting its General Orders, "the Central District was likely unconvinced or uncertain that the safety protocols instituted by state courts were effective enough to combat the spread of COVID-19, particularly given the novelty of the virus at the time." *See* Panel Concurrence at 37 n.3.  If anything, this comment in the concurrence is even more troubling than the opinion's burden-shifting.  According to the concurrence, the Government did not need to present any evidence about safety or mitigation measures, because the Central District General Order indicates that the Central District presumably concluded that "the safety protocols instituted by state courts" were not "effective enough."  *Id*.  But there is absolutely nothing in the record to support the panel's speculation that the Central District ever weighed or assessed such evidence before cancelling all jury trials, much less that there is any evidence to justify the federal court's different approach from that of the state courts.  The suggestion that *no record* ever needs to be made to justify the wholesale suspension of criminal jury trials only underscored the need for en banc review.[18]

---

[18] The panel concurrence speculates that, based on information contained in various *Los Angeles Times* articles, perhaps the federal courts' more extreme response could be justified.  *See* Panel

\*      \*      \*

The district court thus acted within its discretion in concluding that the failure to grant the Government's requested continuance would *not* "be likely to make a continuation of such proceeding impossible."  18 U.S.C. § 3161(h)(7)(B)(i).  This prong of the statutory factor in § 3161(h)(7)(B)(i) did not justify an ends-of-justice continuance.

## IV

The various significant errors recounted above are alone sufficient to have warranted en banc rehearing.  But perhaps the most worrisome aspect of the panel's decision relates to its alternative invocation of the second prong of the statutory factor in § 3161(h)(7)(B)(i), namely, whether a failure to grant a continuance would "result in a miscarriage of justice."  In holding that this factor was present here, the panel reasoned that, because the failure to grant a continuance led to the "subsequent dismissal of Olsen's indictment," that "resulted in a miscarriage of justice."  995 F.3d at 692.  This startling holding—that the Speedy Trial Act's own mandatory remedy of dismissal *itself* can constitute the "miscarriage of justice" that requires *granting* a continuance so as to avoid the unjust dismissal—is demonstrably wrong and effectively guts the mandatory nature of the Act's dismissal remedy.

As the panel noted, *see* 995 F.3d at 691, the district court did not separately consider whether there would be a

Concurrence at 37 n.3.  But it is wholly improper to go outside the record in this way, especially by citing information drawn from sources that are not subject to judicial notice and that the parties have not had an opportunity to address.

"miscarriage of justice," but that is not surprising. The "miscarriage of justice" exception is addressed to whether more time is needed in order to ensure that the fairness of the trial proceedings *themselves*, including the integrity of the trial's fact-finding, is preserved. *See, e.g.*, *United States v. Martin*, 742 F.2d 512, 514 (9th Cir. 1984) (where Supreme Court had granted certiorari to decide whether to overrule Ninth Circuit precedent that precluded the defendant's principal defense to a felon-in-possession charge, district court properly concluded that continuing the trial pending the Supreme Court's decision would avoid a "miscarriage of justice" that might otherwise result); *United States v. Apperson*, 441 F.3d 1162, 1180 (10th Cir. 2006) (in view of the lack of adequate time for Government counsel to prepare for a hearing, a brief continuance was warranted to avoid a "miscarriage of justice"); *United States v. Hill*, 197 F.3d 436, 441–43 (10th Cir. 1999) ("miscarriage of justice" exception properly applied where Government would otherwise be forced to go to trial without a key witness and without adequate time to effectively prepare). The panel concurrence does not cite any "miscarriage of justice" cases that depart from this understanding. *See* Panel Concurrence at 36–37 (citing *Apperson* and *Hill*).

The Government here made no such effort to show that, absent an extension, the trial proceedings would have been rendered unfair or the integrity of the trial's fact-finding would have been impaired. Rather, its only argument for invoking the "miscarriage of justice" exception was that *the Speedy Trial Act's remedy of dismissal* is unjust. The panel opinion agreed, but tellingly, it was unable to cite any authority that would support the novel view that continuances may be granted for the purpose of avoiding a

supposedly unjust application of the statute's mandatory remedy.[19]

Concurring in the denial of rehearing en banc, Judge Bumatay argues that the undefined statutory phrase "miscarriage of justice" is literally broad enough to cover a perceived injustice caused by the Act's own mandatory remedy of dismissal.  Bumatay Concurrence at 58–59.  But this argument ignores the familiar precept that the language of a particular statutory provision should be construed "in light of the statute's structure and purpose."  *See United States v. Tinklenberg*, 563 U.S. 647, 655 (2011) (applying this principle to another Speedy Trial Act exclusion under § 3161(h)); *id*. at 664 (Scalia, J., concurring in part and in the judgment) (agreeing that a reading of text should be rejected if it "would make little sense in light of the context

---

[19] The panel instead noted that the Speedy Trial Act's judicial-emergency provision, 18 U.S.C. § 3174(b), had been invoked in light of the pandemic in order to avoid "releasing would-be convicted criminals into society."  995 F.3d at 693 (quoting *In re Approval of Jud. Emergency Declared in the Cent. Dist. of Cal.*, 995 F.3d 1140, 1143 (9th Cir. Jud. Council 2020)).  But that provision has no application here and, if anything, further undercuts the panel's decision.  Section 3174(b) authorizes across-the-board extensions for systemic difficulties in meeting the Act's deadlines, but in doing so, it operates only prospectively and pointedly does *not* provide any relief for cases (such as Olsen's) that are already in the pipeline.  Instead, § 3174(b) adds an extra 110 days to the 70-day clock, but only for cases filed within up to one year *after* the emergency is declared (and then only if the defendant is not detained solely due to the federal charges).  *See* 18 U.S.C. § 3174(b).  There is no doubt that the judicial emergency provision is, on its face, an exception that is intended to avoid dismissals that would otherwise occur under the regular provisions of the Act.  But that provides no basis for concluding that the ends-of-justice exception, under the *regular* provisions of the Act that apply here, permits courts to treat the Act's own mandatory remedy of dismissal as the miscarriage of justice that justifies an otherwise unlawful continuance.

of the provision and the structure of the statute"). And here, construing the "miscarriage of justice" factor to authorize exclusions of time for the *express* purpose of avoiding the Act's mandatory remedy of dismissal in § 3162 would effectively eliminate the mandatory nature of that remedy. A reading of the Act's substantive provisions that effectively nullifies the central feature of its remedial provision makes little sense and is plainly incorrect.[20]

The panel's analysis of the miscarriage-of-justice statutory factor, which also draws on the opinion's list of non-statutory factors, underscores how the panel has converted the Speedy Trial Act's mandatory remedy into a discretionary remedy. In explaining why the dismissal of Olsen's indictment that flows from denying a further continuance is unjust, the panel emphasizes that (1) Olsen "was on pretrial-release" for "years"; (2) Olsen's alleged crimes were very serious, involving "his prescribing

---

[20] Because I resolve the issues here on statutory grounds, I do not reach the Sixth Amendment question addressed in Judge Bumatay's concurrence. It seems doubtful, however, that the general interpretive line that Judge Bumatay draws—*i.e.*, that the Speedy Trial Clause is largely limited to avoiding "prolonged *pretrial detention* by the government," *see* Bumatay Concurrence at 46—is correct. The text of the Sixth Amendment provides for "the right to a speedy and public trial" in "*all* criminal prosecutions," and not merely those in which the defendant is detained pending trial. U.S. CONST. AMEND. VI (emphasis added). As the text of the Eighth Amendment confirms, the Framers were well aware of the concept of bail, and had they wanted to limit the protection of the Speedy Trial Clause to those not admitted to bail, they could readily have added language to that effect. They did not. *See also Betterman v. Montana*, 578 U.S. 437, 442 (2016) (noting that the objectives of the clause included, not just avoiding "oppressive incarceration prior to trial," but also "minimizing anxiety and concern accompanying public accusation, and limiting the possibilities that long delay will impair the ability of an accused to defend himself") (simplified).

dangerous combinations and unnecessary amounts of highly regulated pain medications"; (3) Olsen obtained multiple continuances, followed by his later change to "insist[ing] on sticking to his scheduled trial date"; and (4) the prosecution was "blameless" for the Central District's General Order. 995 F.3d at 692. Many of these factors overlap with the non-statutory factors that the panel stated that the district court should have considered. *See supra* at 84–85; *see also* 995 F.3d at 692. The panel effectively decided that, based on these considerations, Olsen did not *deserve* the protections of the Speedy Trial Act. That is, because insisting on a speedy trial would lead to dismissal, and because Olsen was unworthy of any such dismissal (even without prejudice) in light of the panel's evaluation of his circumstances, a continuance had to be granted in order to avoid the otherwise mandatory (and unjust) dismissal.

I agree that these sorts of considerations may enter into the decision whether, after a Speedy Trial Act violation has occurred, to dismiss the indictment *with or without prejudice*. We know that because the statute says so:

> In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice.

18 U.S.C. § 3162(a)(2). And I agree that, in light of these factors, the district court abused its discretion in dismissing the indictment with prejudice rather than without

prejudice.[21]  But it is quite another matter to say that, because *any* dismissal of the indictment—even one without prejudice—would supposedly be a "miscarriage of justice," the district court may on that basis continue a criminal jury trial.  It is hard to overstate how destructive this holding is to the Act's mandatory dismissal remedy, which is expressed in "categorical terms."  *Zedner*, 547 U.S. at 508.  By allowing continuances to be granted—even by the "judge on his own motion," 18 U.S.C. § 3161(h)(7)(A)—on the ground that the defendant does not deserve the Act's mandatory remedy, the panel's decision threatens to destroy a central feature of this singularly important statute.

*             *             *

For the foregoing reasons, I respectfully dissent from the denial of rehearing en banc.

---

[21] I do not necessarily agree, however, with the panel's assessment of some of the factors in Olsen's case.  For example, without reciting any of the details concerning the earlier continuances of Olsen's trial, the panel insinuates that Olsen's opposition to a further continuance of the October 2020 trial date was gamesmanship.  995 F.3d at 692.  But as the more complete record of those continuances makes clear, many of them were granted based on issues concerning Olsen's attorneys, as well as counsel's need for sufficient time to prepare in this complex case.  *See supra* at 67–69.  That Olsen needed substantial initial time to prepare to defend against his 35-count indictment does not mean that therefore he has to acquiesce in open-ended further continuances long after all parties are ready for trial.